193 F.3d 415 (6th Cir. 1999)
 RICHARD C. BECHERER, ET AL., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS,
J. DON ADAMS; KAY A. ARCENEAUX, AS EXECUTRIX FOR THE DONALD J. ARCENEAUX, SR. ESTATE; EDWARD R. BASSINE; ANNE T. BASSINE; THOMAS H. BLUNDELL; JAN L. BLUNDELL; JAMES A.
CAMPBELL; DARRELL R. CAUDILL; WILLIAM A. CHERRY; CATHERINE CREBBS, AS GENERAL PARTNER OF CCT & CO. AS ADMINISTRATRIX OF ESTATE OF ROBERT W. CREBBS; MICHAEL S. DWYER; DICK DYKES; L. JOE EDMONSON; FRANCIS C. ELKIN; RICHARD G. FADAL; LEE FEINBERG; MADELINE FEINBERG; ALAN S. FOGG; JEAN M. FOGG; MARY LOU FRAZIER; RUDOLPH M. GAEDKE, INDEPENDENT ADMINISTRATOR FOR THE ESTATE OF MARY GAEDKE; FRANCISCO M. GONZALEZ; TERRY W. GRENAT; EDITH A. GRENAT; MR. & MRS. HEM C. GUPTA; PAUL D. HANSEN; JUDITH A. HANSEN; KEITH HARVIE; BETTY LEE HARVIE; ROBERT HAWLEY; ROBIN DALE HAWLEY; CHARLES L. HENRITZY; GEORGIANN HENRITZY; CURTIS B. HERBERT, JR.; WELDON HIDDLESTON; DOROTHY M. HIDDLESTON; HURRELBRING ADVERTISING, INC.; BOBBY G. LAMB; HAZELTINE LAMB; D. ROD; ANN H. LEE; LAW OFFICES OF PAT MALONEY, P.C.; DAN E. MARTENS; SUSAN J. MARTENS; PHILLIP W. MCCOLLUM; MARJORIE K. MCCOLLUM; EARL MCGAVRAN; EDITH E. MCGAVRAN; ALICE S. MCTURK; KYRIAKOS MICHAELIDES; MARGARET MICHAELIDES; DONALD R. MITCHELL; FRED MORGAN; CHRISTINE MOTLER, AS EXECUTRIX FOR THE ESTATE OF JAY MOTLER; HAROLD MUELLER; CLAUDE NABERS; LEON NEIMAN; JUDITH A. NEIMAN; DANIEL N. PAYTON, III; JANE H. PAYTON; JEAN A. PITTS; GARY L. PLATNER; ALVIN L. PRICHARD, JR.; MARILYN M. DAVID, FORMERLY KNOWN AS MARILYN M. PRICHARD; SURAJ P. SANCHETI; LEE MARIA; LULA SANTA MARIA; MABEL SCHENK, AS EXECUTRIX FOR THE ESTATE OF SAMUEL SCHENK; ARCH H. SCHROM; SHIRLEY A. SCHROM; THOMAS Q. SCHULTZ; RUTH R. SCHULTZ; ROBERT STERN; ROXANNE STERN; GORDON G. STILLWELL; THERRAL STORY; KATHY STORY; WELLINGTON K. STRETTON; MARY ANN KOZLOWSKI; JOSHUA M. THARP, JR.; MARY SUE THARP; RONALT T. ULLENBERG; SHEILA ANN ULLENBERG; ROBERT J. WILDER; BUTZ S. WILDER; PAUL A. WILLIAMS; STEPHEN F. WOOD, INTERVENORS-APPELLANTS,
v.
MERRILL LYNCH, PIERCE, FENNER AND SMITH, INC.; CAN-AMERICAN CORPORATION; CAN-AMERICAN REALTY CORPORATION; SHELTER SEAGATE CORPORATION; GARRETT G. CARLSON; GRAHAM C. COUNT; ARNI THORSTEINSON; MARTIN CICCO; LAVENTHOL & HORWATH; M.A. MORTENSON CO.; WINSOR/FARICY ARCHITECTS, INC.; TRUSTBANK MORTGAGE CENTER, INCORPORATED; MIDWEST TITLE GUARANTEE COMPANY OF FLORIDA; FRANK LAVIN,
 No. 96-1673
 U.S. Court of Appeals, Sixth Circuit
 Argued: June 17, 1998
Decided: September 30, 1999
 
 Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 89-72502--John Feikens, District Judge.
 Bruce E. Gerstein, Garwin, Bronzaft, Gerstein & Fisher, New York, NY; Elwood S. Simon, John P. Zuccarini, Elwood S. Simon & Associates, Birmingham, MI, for Plaintiff.
 Monique K. Cirelli, Barris, Sott, Denn & Driker, Detroit, MI; Thomas R. Grady (argued and briefed), Grady & Associates, Naples, FL, for Intervenors-Appellants.
 David C. Andrew, Baker, Donelson, Bearman & Caldwell, Memphis, TN; SheldonH. Klein (briefed), Butzel Long, Detroit, MI; Barbara L. McQuade, Office of the U.S. Attorney, Detroit, MI; Dennis K. Egan (argued and briefed), Egan & Mazzara, Detroit, MI, for Defendants-Appellees Merrill Lynch, Fenner & Smith, Inc. and Martin Cicco.
 Jon B. Gandelot, Grosse Pointe Woods, MI; Steve W. Gaskins, Cosgrove, Flynn, Minneapolis, MN, for Defendants-Appellees Can-American Corp., Can-American Realty Corp., Garrett G. Carlson, Graham C. Count and Arni Thorsteinson.
 Stephen F. Wasinger, Wasinger, Kickham & Kohls, Royal Oak, MI, for Defendant-Appellee Laventhol & Horwath.
 Lawrence G. Campbell, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, MI; Robert P. Hurlbert, Dickinson, Wright, Moon, Van Dusen & Freeman, Chicago, IL, for Defendant-Appellee M.A. Mortenson Co.
 James R. Case, Kerr, Russell & Weber, Detroit, MI; Melissa M. Horne, Winograd, Shine, Providence, RI, for Defendant-Appellee Winsor/Faricy Architects, Inc.
 Jonathan T. Walton, Jr., Laura S. Stafford, Detroit, MI, for Defendant-Appellee Trustbank Mortgage Center, Inc.
 Frank W. Brochert, Plunkett & Cooney, Detroit, MI; Lawrence G. Campbell, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, MI, Timothy D. Wittlinger, Clark Hill, Detroit, MI, for Defendant-Appellee Midwest Title Guarantee Co. of Florida.
 Sheldon H. Klein (briefed), Detroit, MI; Barbara L. McQuade, Office of the U.S. Attorney, Detroit, MI; Dennis K. Egan (argued and briefed), Egan & Mazzara, Detroit, MI, for Defendant-Appellee Frank Lavin.
 Before: Martin, Chief Judge; Merritt, Kennedy, Nelson, Ryan, Boggs, Norris, Surheinrich, Siler, Batchelder, Daughtrey, Moore, Cole, Clay, and Gilman, Circuit Judges.
 RYAN, J., delivered the opinion of the court, in which MERRITT, NELSON, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, COLE, CLAY, and GILMAN, JJ., joined. MOORE, J. (pp. 27-41), delivered a separate opinion Concurring in the judgment, in which DAUGHTREY, J., joined. KENNEDY, J. (pp. 42-53), delivered a separate Dissenting opinion in which MARTIN, C. J., and BOGGS, J., joined, with MARTIN, C. J., (pp. 54-58), also delivering a separate Dissenting opinion.
 Ryan, Circuit Judge.
 
 
 1
 We granted en banc review in this case to decide whether the district court erred in holding that the doctrine of res judicata binds the intervenors-appellants, hereinafter the "Florida plaintiffs," to the district court's judgment on certain non-class claims in litigation filed by the above-named plaintiffs, hereinafter the "Becherer plaintiffs," thereby precluding the Florida plaintiffs from prosecuting an action against the defendants in this case in Florida state court. We hold that the Florida plaintiffs are bound by the district court's judgment only to the extent they were included in the Fed. R. Civ. P. 23(b)(3) class certified in the original action in March 1991, and then only to the extent of the issues that were adjudicated as to that certified class.
 
 I.
 
 2
 The Becherer plaintiffs and the Florida plaintiffs are investors in a Florida condominium/hotel development. The Becherer plaintiffs filed suit in August 1989 in the United States District Court for the Eastern District of Michigan alleging fraud, securities violations, breach of contract, and other claims against the hotel's developers, the securities broker, the escrow agent, and the financial institution involved in the financing of the project. See Becherer v. Merrill Lynch, Pierce, Fenner &Smith, Inc., 799 F. Supp 755, 762 (E.D. Mich. 1992) ("Becherer I"). The Becherer plaintiffs requested class certification under Fed. R. Civ. P. 23(b)(3) in November 1989. The Florida plaintiffs were originally putative class members in the Becherer suit.
 
 
 3
 In March 1991, the district court certified a class consisting of both the Becherer plaintiffs and the Florida plaintiffs, but only as to two contract claims against the developer/construction company defendants, Shelter Seagate Corporation and its affiliates, or SSG. See Becherer I, 799 F. Supp. at 761-62, 784. The class prevailed in this action: The district court granted summary judgment in the class's favor and awarded $6.7 million in damages on one of the contract claims in May 1991. See id. at 761, 785. As to the other contract claim, after a bench trial, the district court found a breach by the relevant defendants, but no damages resulting therefrom. See id. at 767.
 
 
 4
 In February 1992, the district court certified another class, once again consisting of both groups of plaintiffs, for the purpose of ratifying a proposed settlement of all remaining claims of the investors against the remaining defendants. Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 809 F. Supp. 1259, 1263 (E.D. Mich. 1992) ("Becherer II"). Because this class was also certified under Fed. R. Civ. P. 23(b)(3), the court gave all putative class members until April 3, 1992, to object to the proposed settlement. See id. at 1278. On April 3, 1992, 44 plaintiffs, including many of the Florida plaintiffs, did object. Additionally, the law firm representing these objectors reserved the right to add to the list of plaintiffs who were objecting, as the court had extended the time for doing so until April 14. Under the terms of the proposed settlement, the number of investors electing to opt out "was sufficient to scuttle the agreement" and vitiate the class certification. Id. at 1264. Significantly, all of the Florida plaintiffs either opted out of the proposed settlement class, or reserved their right to object to the proposed settlement.
 
 
 5
 The Florida plaintiffs then filed fraud claims in a Florida state court practically identical to those filed in the federal district court by the Becherer plaintiffs; and it is this filing that gives rise to the issue before us today. None of the named Becherer plaintiffs participated in the Florida case.
 
 
 6
 In August 1992, after the collapse of the proposed settlement and settlement class, and after the filing in the state court by the Florida plaintiffs, the district court dismissed on summary judgment all of the Becherer plaintiffs' remaining claims against the other defendants. See id.; Becherer I, 799 F. Supp. at 767-75. Subsequently, the district court in Michigan enjoined the Florida plaintiffs from pursuing their claims in the Florida state court, pursuant to the relitigation exception found in the Anti-Injunction Act, 28 U.S.C. § 2283. See Becherer II, 809 F. Supp. at 1269, 1271, 1276. The district court held that because both groups' interests were identical and they had a "sufficiently close" relationship, the Florida plaintiffs were bound, under the principles of res judicata and collateral estoppel, by the summary judgment against the Becherer plaintiffs. Id. at 1267-68.
 
 
 7
 On appeal, we reversed in part, holding, in an opinion by Judge Cornelia Kennedy, that the theory of claim preclusion relied on by the district court was "impermissibly broad." Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 43 F.3d 1054, 1070-71 (6th Cir. 1995) ("Becherer III"). We determined that the district court erred in finding "virtual representation" based solely on identity of interests and a close relationship, because this form of claim preclusion requires, among other things, "'an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues.'" Id. at 1070 (citation omitted). We acknowledged "that courts will refuse to applyvirtual representation simply to preclude a nonparty from relitigating issues that have been lost after vigorous advocacy by a party who seems to hold an interest identical to the interests of the nonparty." Id. Thus, we recognized "the need to keep the doctrine [of virtual representation] within strict confines," id., and we remanded for a determination whether a legal relationship existed between the Becherer plaintiffs and the Florida plaintiffs such that the former group was accountable to or controlled by the latter group, see id. at 1071. In dicta, however, we intimated that if the Florida plaintiffs, acting through the Association of Unit Owners, or AUO, of which all plaintiffs in both groups were members, "authorized, financed, and controlled the investigation and prosecution of the Becherer plaintiffs' suit, including hiring an attorney and arranging to pay him a combination retainer and contingency fee," then collateral estoppel would probably bar the Florida plaintiffs' claims. Id. (emphasis added).
 
 
 8
 On remand, the district court made 67 findings of fact as to the collateral estoppel issue. Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 920 F. Supp. 1345, 1357-67 (E.D. Mich. 1996) ("Becherer IV"). The district court also dismissed the Becherer plaintiffs' Land Sales Act claims against Merrill Lynch and SSG, and we affirmed that decision on the Becherer plaintiffs' appeal. Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 127 F.3d 478, 479-80 (6th Cir. 1997) ("Becherer V"). With respect to the res judicata issues, the district court found that the AUO was the real party in interest in the Becherer case, and that "the AUO authorized, financed, and controlled the investigation and prosecution of the Becherer plaintiffs' suit." Becherer IV, 920 F. Supp. at 1367 (emphasis added). Importantly, however, the district court made no explicit finding as to whether the Florida plaintiffs authorized, financed, and controlled the AUO to prosecute the Becherer suit, other than that "[e]ach Florida plaintiff is or has been associated with the AUO as a unit owner or through a limited partnership." Id. at 1357. The Florida plaintiffs point out, and the district court acknowledged, that membership in the AUO was mandatory for all investors in the hotel. See id. The only other findings made by the district court which may be said to establish any of the virtual representation factors connecting the Florida plaintiffs and the Becherer plaintiffs, through the AUO, are the following, which we have paraphrased:
 
 
 9
 1. Florida plaintiffs' counsel, Thomas Grady, told a Florida court in 1990 that the resolution of the Becherer case in the Eastern District of Michigan would determine the rights of his clients in the Florida case.
 
 
 10
 2. All unit owners, including the Florida plaintiffs, had access to the Becherer plaintiffs' counsel, Elwood S. Simon, and had access to information about the litigation, and Simon sought their input so that he could represent their interests. The unit owners as a group had "many opportunities" to object to the AUO's litigation efforts, but instead gave a positive "overall response." (We note, however, that the record indicates the Florida plaintiffs own approximately 60 of the 474 total hotel units. Thus, they quite obviously would not control a majority vote in the AUO.)
 
 
 11
 3. At least four Florida plaintiffs retained Simon to represent them.
 
 
 12
 4. Approximately 29 Florida plaintiffs contributed $14,500 out of the total $58,500 received by the class-action expense fund.
 
 
 13
 5. In 1992, 22 Florida plaintiffs signed affidavits requested by Simon opposing defendants' motions for summary judgment.
 
 
 14
 6. Florida plaintiffs' counsel, Grady, and the Becherer plaintiffs' counsel, Simon, "worked closely together at the time that litigation strategies were being formulated." Grady and Simon "worked as a team to further their mutual interests."7. Grady had a "working relationship" with the AUO Board and with some of the Becherer plaintiffs.
 
 
 15
 8. The Becherer plaintiffs claimed to adequately represent the Florida plaintiffs' interests.
 
 
 16
 9. Grady acknowledged that the Florida plaintiffs' interests were congruent to those of the AUO.
 
 
 17
 10. Grady believed that the Florida plaintiffs' interests were being adequately represented by Simon and the Becherer plaintiffs.
 
 
 18
 11. Grady recognized a possibility that his clients would be bound by the Becherer decisions, even in the absence of class certification, and so advised his clients.
 
 
 19
 12. The Florida plaintiffs decided to forego individual claims against the defendants so they could "wait and see" if the class action furthered their objectives.
 
 
 20
 See id. at 1357-70. Based upon these findings, the district court held that the Florida plaintiffs and the Becherer plaintiffs were in privity, as that term is understood in the context of the law of res judicata, and thus, under the doctrine of virtual representation, the Florida plaintiffs were barred from further litigating this matter. Id. at 1367.
 
 
 21
 In ruling that its findings of fact mandated barring the Florida plaintiffs because they had been virtually represented, the district court first established that the AUO controlled the Becherer litigation. See id. at 1368. The court relied on the facts that the AUO hired and paid Simon, and directed his investigation and prosecution of the putative class action. In finding that the Florida plaintiffs in turn controlled or could hold accountable the AUO, the court opined that the AUO had a fiduciary relationship to all its investor-members, including the Florida plaintiffs. The court acknowledged that (1) the AUO must have acted in its capacity as fiduciary in prosecuting the Becherer suit in order to have represented all the unit owners, (2) the AUO did not formally file the Becherer case, and (3) it may not have had authority to do so. Nevertheless, the court concluded that the AUO represented the Florida plaintiffs because those plaintiffs took that position "when it... served their interests." Id. The court did not explain how the plaintiffs' taking a particular position could establish a fiduciary relationship.
 
 
 22
 Next, according to the district court, the Florida plaintiffs improperly maneuvered in order to avoid the potential effects of res judicata. See id. The court observed that the Florida plaintiffs' counsel contemporaneously argued to two different Florida courts both that the Becherer action would, and that it would not, resolve the issues in the Florida case, depending on which position was most advantageous in the particular courtroom. See id. However, the Florida plaintiffs point out that the initial representation was made in 1990 before the settlement was even proposed, while the latter statement was made in 1995, well after the proposed settlement had collapsed. The district court's findings do not contradict the Florida plaintiffs' explanation in this regard.
 
 
 23
 Proceeding down the list of factors set out in Becherer III, the district court then found that the Florida plaintiffs were active in the Becherer litigation, either by supplying money and affidavits, or by "acquiesc[ing]" in the actions taken by the AUO. Id. at 1369. The court supported this last contention by stating that unit owners had many opportunities to object to the AUO's handling of the case and that "the overall response to the AUO's efforts was positive." Id. The court also found, in this regard, that the parties' attorneys, Grady and Simon, worked closely together and that this fact establishes the Florida plaintiffs' active participation. Id. However, the court did not distinguish between cooperation before, and after, the proposed settlement.
 
 
 24
 Finally, the district court implied that Simon was accountable to Grady "[i]n thesense that Simon risked losing the support of his teammates if he rebuffed their concerns in conducting the Becherer litigation." Id. at 1370. Notably, this is the only reference in the district court's Discussion of accountability and control which addresses the Florida plaintiffs' connection with the Becherer plaintiffs, as opposed to the connection between the AUO and the Becherer plaintiffs, or between the Becherer plaintiffs and the unit owners at large. Again, this finding also apparently references conduct before the proposed settlement. On the basis of these findings, the district court found that the Florida plaintiffs were barred by res judicata from litigating their claims in Florida state court.
 
 
 25
 This appeal followed, and a panel of this court issued an opinion reversing the district court's judgment, holding that the district court erred in its application of the law of virtual representation insofar as it "relied on events... that were largely irrelevant in establishing whether the Florida plaintiffs controlled, could hold legally accountable, or acquiesced in being represented by the Becherer plaintiffs" and "failed to make findings sufficient to demonstrate that the Florida plaintiffs controlled, held accountable, or acquiesced after the class settlement was proposed in 1992." Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. 96-1673, 1997 WL 741361, at *12 (6th Cir. Dec. 3, 1997) ("Becherer VI") (withdrawn for en banc review). Subsequently, we granted en banc review and vacated the panel opinion. Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 131 F.3d 593 (6th Cir. 1998). For the reasons that follow, we now reverse the district court's decision and vacate its injunction.
 
 II.
 
 26
 This court reviews a district court's findings of fact for clear error, and its Conclusions of law de novo. Kildea v. Electro-Wire Products, Inc., 144 F.3d 400, 404 (6th Cir. 1998).
 
 III.
 
 27
 Our en banc review of this case requires us to decide whether and to what extent legal principles of res judicata preclude the Florida plaintiffs from pursuing their fraud claims after the federal court's judgment in the Becherer litigation. We hold that the Florida plaintiffs are precluded from asserting only such claims as were adjudicated by the court on behalf of the class of which the Florida plaintiffs were members. Specifically, the Florida plaintiffs are barred from relitigating only the certified class claims against SSG adjudicated by the district court on May 7, 1991 and August 7, 1992, which are referenced in Becherer I, 799 F. Supp. at 761, 766-67, 785-90.
 
 
 28
 Res judicata bars a subsequent action "if the following elements are present: (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their 'privies'; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action." Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 880 (6th Cir. 1997) (emphasis omitted). In this case, the first, third, and fourth elements have been established and are not in dispute.
 
 
 29
 The second element, the concept of privity, has been divided into three categories. First, those who are successors in interest to a party will be bound by a judgment against that party. Second, a nonparty who controlled the original suit will be bound by the resulting judgment. Third, a nonparty who is adequately represented by a party will also be precluded from relitigating the same issues. Becherer III, 43 F.3d at 1070 (citing Southwest Airlines Co. v. Texas Int'l Airlines, Inc., 546 F.2d 84, 95 (5th Cir. 1977)).
 
 
 30
 This case does not involve the first category. The second and third categoriescontrol and adequate representation--are distinct theories on which to base a finding of privity. As to the second category--control--we agree that "'[t]o have control of litigation requires that a person have effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action. He must also have control over the opportunity to obtain review.'" Benson and Ford, Inc. v. Wanda Petroleum Co., 833 F.2d 1172, 1174 (5th Cir. 1987) (citation omitted). The third privity category--adequate or "virtual" representation--requires "'an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues.'" Id. at 1175 (emphasis added) (citation omitted). This third category may also be established by a nonparty's express agreement to be bound by or acquiescence to a party's representation. See, e.g., Restatement (second) of Judgments § 40 (1980). However, absent an express agreement to be bound, an agreement should not be inferred "'except upon the plainest circumstances.'" Bittinger, 123 F.3d at 882 (emphasis in original) (quoting Restatement (second) of Judgments § 40 cmt. b). This case does not involve an express agreement to be bound. In the class action setting, as detailed below, logic dictates, and our precedent requires, that the issue of acquiescence be determined in light of Fed. R. Civ. P. 23.
 
 
 31
 The district court employed a hybrid analysis of the "control" and "adequate representation" aspects of privity in ruling that res judicata barred the Florida plaintiffs' action. See Becherer IV, 920 F. Supp. at 1367. Whatever analysis a court applies, however, minimum standards of due process require that, in order to be claim precluded, a nonparty must (A) have actual control over the first litigation, (B) be able to hold the first party or its attorney legally accountable for the result in the first action, or (C) be able to rescind its express or implied consent to being represented by the first party if it deems its interests diverge sufficiently early in the litigation.
 
 A.
 
 32
 We address the control category first. The Benson and Ford court found that "control" required a relationship akin to that between a president/sole shareholder and his or her company, a parent corporation and its subsidiary, an indemnitor and its indemnitee, or a liability insurer and an insured. See 833F.2d at 1174. Thus, in that case, supplying an attorney, helping to finance the litigation, testifying as a witness, participating in consolidated pretrial proceedings, and even making limited presentations to the court in the first action, constituted insufficient "control" to be precluded in a subsequent action asserting the same facts and legal theories. Id.
 
 
 33
 The Florida plaintiffs did not control the Becherer plaintiffs. There is no evidence that the Florida plaintiffs--cumulatively as individuals, or collectively as a group--chose Simon as counsel in the Becherer suit, or that they in any way dictated or even influenced the bringing of the suit, the conditions of the proposed settlement, or the arguments made in opposition to summary judgment in the Becherer action. While a handful of the Florida plaintiffs may have individually retained Simon, signed affidavits, contributed money to the first case, and communicated regarding the progress of the case, there is no evidence that these few could have exercised any authority over the Becherer action which could reasonably be called "control." As in Benson and Ford, the actions of the Florida plaintiffs were insufficient to establish preclusive control. Moreover, if the Florida plaintiffs' actions are indicia of control, there is no evidence whatsoever that any of them were taken after the settlement was proposed in 1992. In fact, had the Florida plaintiffs controlled the negotiation of the proposed settlement, there would have been no reason to opt out of the conditional class in thefederal district court and file a separate suit in Florida.
 
 B.
 
 34
 Next, we examine "adequate" or "virtual" representation. "Adequate representation" denotes "'an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues.'" Benson and Ford, 833 F.2d at 1175 (emphasis added) (citation omitted); see also Becherer III, 43 F.3d at 1070. Thus, after a car crash in which a father was injured and his daughter killed, the father was not precluded from bringing a wrongful death action on behalf of his family after he had already lost a suit against the same defendant for his own injuries. Benson and Ford, 833 F.2d at 1175 (citing Freeman v. Lester Coggins Trucking, Inc., 771 F.2d 860 (5th Cir. 1985)). Despite the fact that the same attorney was used, the same accident was at issue, and the same negligence was alleged, the family's claims were not precluded because they "had their own personal claims... and were due their day in court." Id. There existed no legal relationship, express or implied, between the father and the other members of his family by which the latter could hold the former legally responsible for the outcome of the first litigation, if, for example, the father or his attorney had been negligent in the prosecution of the first case.
 
 
 35
 Similarly, there is no evidence that the Florida plaintiffs here could have held the Becherer plaintiffs, the AUO, or Simon legally accountable for the result of the Becherer litigation. First, although the AUO may have held a fiduciary relationship vis-a-vis all unit owners, the AUO's responsibilities were to run the hotel. The district court made no findings which indicate that the AUO was authorized to bring a lawsuit on behalf of its members. To the contrary, the AUO Board of Directors disclaimed authority to bring such an action.
 
 
 36
 Second, the only factual finding which supports accountability is that three Florida plaintiffs retained Simon to represent them. Plaintiff Spencer, purported by the district court to be a Florida plaintiff who retained Simon, see Becherer IV, 920 F. Supp. at 1361, is not listed as one. Even if not clearly erroneous, the district court's finding of retainer by the other three establishes only that these three plaintiffs could hold him accountable; there is no evidence that the remainder of the plaintiffs before us had any legal relationship of accountability with the Becherer plaintiffs, the AUO, or Simon.
 
 
 37
 In its findings, the district court relied on retainer agreements addressed to Simon and his former firm, signed between June 6 and June 12, 1989, by Florida plaintiffs Mary Lou Frazier, Phillip W. McCollum, and Robert Hawley. However, these plaintiffs note that (1) Simon himself has denied that he represented them individually, and the retainer agreements in question were apparently sent to him without his request or assent; (2) Grady has testified that none of his clients considered himself represented by Simon in any capacity other than the class action against SSG; and (3) none of the retainer agreements referenced by the district court in making its findings was signed by any law firm.
 
 
 38
 If the district court's finding that at least three Florida plaintiffs were represented by Simon is not clearly erroneous, that finding does not establish that he represented them after the SSG victory. Although the retainer agreements themselves do not limit Simon's representation temporally, or to the SSG defendants in particular, there is no evidence that Simon did, in fact, continue as counsel for these individuals after the SSG litigation. We have been provided no evidence demonstrating payments by these plaintiffs to Simon, or the assertion of privilege on their behalf, or any legal communications between Simon and these plaintiffs after the SSG verdict. Moreover, Simon's representationof these plaintiffs surely terminated upon their retention of Grady. See Stroud v. Ward, 425 N.W.2d 490, 493 (Mich. Ct. App. 1988). Thus, the record is insufficient to find that Frazier, McCollum, Hawley, or any of the other Florida plaintiffs could hold Simon legally accountable for his actions in the post-SSG Becherer litigation.
 
 C.
 
 39
 Finally, we turn to the issue of acquiescence. There is substantial evidence that the Florida plaintiffs acquiesced to representation by the Becherer plaintiffs before the class settlement was proposed. However, this is not enough to hold the Florida plaintiffs to the judgment rendered after they opted out of the class, the settlement collapsed, and they filed suit in Florida court.
 
 
 40
 "Acquiescence" means "[p]assive compliance or satisfaction," Black's Law Dictionary 24 (6th ed. 1990), or "the act or condition of... giving tacit assent." Random House Compact Unabridged Dictionary 18 (Spec. 2d ed. 1996). In this setting, Fed. R. Civ. P. 23 subsumes the inquiry into representation by acquiescence. See Bittinger, 123 F. 3d at 882. More specifically, Rule 23 encourages putative class members to "acquiesce" in the representation of the named plaintiffs, but elsewhere mandates that these putative plaintiffs be allowed, before a court-imposed date, to expressly exclude themselves or "opt out" of the class. Binding the Florida plaintiffs to the Becherer judgment would surely defeat the purposes, if not the letter, of Rule 23.
 
 
 41
 The plaintiffs sought class certification under Rule 23(b)(3), which provides: An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 
 
 42
 (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
 
 
 43
 Fed. R. Civ. P. 23(b)(3). Rule 23(c)(1) provides that the court's determination as to whether an action will be maintained as a class action shall be made "[a]s soon as practicable after the commencement of an action brought as a class action." Fed. R. Civ. P. 23(c)(1). In appropriate circumstances, the district court may, as in the instant case, certify a class only as to particular issues. Fed. R. Civ. P. 23(c)(4)(a).
 
 
 44
 Rule 23(c)(2) requires that the court, in any class action maintained under subrule (b)(3), provide notice to the individual class members in the best manner available to ensure class members receive notice. Such notice must advise potential class members that
 
 
 45
 (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if the member desires, enter an appearance through counsel.
 
 
 46
 Fed. R. Civ. P. 23(c)(2) (emphasis added). Due process concerns mandate the opt-out mechanism. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812 (1985). Thus, the minimum requirements of due process inform both res judicata and class-action doctrines,and as such, both must be considered here.
 
 
 47
 In Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983), a putative class member failed to comply with a statute of limitations in filing his independent claim, although the class action had been timely filed. The Court held that the statute was to be tolled for all purported members of the class until the class action had run its course. Otherwise, the purposes of Rule 23 would be thwarted: There would be needless duplicity of claims as potential class members each filed separately in order to preserve their rights and comply with the limitations period; furthermore, putative plaintiffs would lose their right to opt out if the limitations period were allowed to expire while the class was being formed. Id. at 351. The Court noted:
 
 
 48
 There are many reasons why a class member, after the denial of class certification, might prefer to bring an individual suit rather than intervene. The forum in which the class action is pending might be an inconvenient one, for example, or the class member might not wish to share control over the litigation with other plaintiffs once the economies of a class action were no longer available. Id. at 350.
 
 
 49
 When a class is certified, Rule 23 implicitly discourages members from filing separate claims, by allowing those dissatisfied with the representation of the named plaintiffs to opt out before a specified date. In other words, despite the identity of interests, facts, and legal theories that make a class possible in the first place, a plaintiff has the right to pursue his or her separate action. This right remains intact even after a plaintiff initially acquiesces in representation by others. As long as effected before the cutoff date promulgated by the court, opt out is available to class members even though they may have benefitted from the economies of scale inherent in the representation up to that point by class counsel. As a result, it would defeat the clear purposes of Rule 23 to bar a group of plaintiffs, who were putative members of a class but either opted out or retained their right to opt out, from litigating separately.
 
 
 50
 The only arguable evidence that any Florida plaintiffs acquiesced to the representation by the Becherer plaintiffs after February 1992 is 22 affidavits signed by Florida plaintiffs in opposition to summary judgment in the Becherer case. However, weighed against this tenuous indication of acquiescence by mere testimony are the substantial facts that these plaintiffs either opted out or reserved their right to opt out of the class within the time allowed by the district court, and that they each filed suit separately in Florida state court before the Becherer litigation had concluded. If they were subsequently held to the judgment against the Becherer plaintiffs, their due process-based right to timely opt out of the settlement under the rule and their timely reservation of that right would be meaningless. Indeed, contrary to the rule's opt-out provision, the Florida plaintiffs would be held hostage to litigation that they could not control.
 
 
 51
 The Florida plaintiffs also cannot be held to have acquiesced in the AUO's representation because membership in the AUO is required of all investors. Only by divesting their interest in the hotel could the Florida plaintiffs have disassociated themselves from the AUO. Such extraordinary action is not required to demonstrate an intention not to be bound by the AUO's actions, especially in light of the more reasonable and precise rule-based steps that these plaintiffs did take--opting out and filing an independent claim. Moreover, a Conclusion that the Florida plaintiffs' opportunity to participate in the litigation with the AUO through their "seat at the table" is sufficient to show adequate representation and defeat the requirements of Rule 23 and ignore the due process concerns on which the opt-out provision is based would deny these plaintiffsany meaningful opportunity to timely rescind consent.
 
 
 52
 Rule 23(c)(2) provides the legal basis for a finding, when necessitated by subsequent litigation by class members, that those class members who do not request exclusion from membership are bound by the court's adjudication of class issues. "[I]n drafting the rule every attempt was made to maximize the likelihood that a court would decide that the judgment would be binding on all members of the class." 7B Charles Alan Wright, et al., Federal Practice and Procedure § 1789, at 246 (2d ed. 1986). "However, if an action is not properly certified, then any judgment that is entered will not be a class judgment and it will not bind persons who are not named parties to the dispute." Id. at 243 (emphasis added); see also id. at n.12 (Supp. 1999) (citing Bittinger, 123 F.3d 877). Thus, although Rule 23 cannot operate as a rule of claim preclusion, because it is well-settled that a judgment's preclusive effect may be "tested only in a subsequent suit," id. at 245, Rule 23(b)(3), with subrule (c)(2), absent control or a legal relationship of accountability, provides the best, if not the only, indication of a class member's consent, tacit or otherwise, to class representation by another. We acknowledged as much in Bittinger, which intervened between the district court's decision in Becherer IV and this appeal.
 
 
 53
 In Bittinger, we recognized that the Supreme Court's decision in Richards v. Jefferson County, 517 U.S. 793 (1996), which, like Bittinger, was decided subsequent to Becherer III and Becherer IV, "requires a more limited analysis [of privity than the virtual representation analysis in Becherer III] subject to the rules articulated in the [Restatement (second) of Judgments] and Rule 23." Bittinger, 123 F.3d at 882. Thus, we rejected application of the doctrine of virtual representation in a class action case because it was an "unruly standard" that would effect "an end run around the limitations of Rule 23." Id. We refused to hold the Bittinger class bound to earlier attempted class action litigation by different named plaintiffs where the district court dismissed the case on a motion for summary judgment, never reaching the class certification issue. See id. In reaching that Conclusion, in lieu of principles of virtual representation, we relied on section 41 of the Restatement (second) of Judgments as more consistent with the requirements of Rule 23 and the governing Supreme Court precedent. The Restatement provides:
 
 Person Represented by a Party
 
 54
 (1) A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party. A person is represented by a party who is:
 
 
 55
 (a) The trustee of an estate or interest of which the person is a beneficiary; or
 
 
 56
 (b) Invested by the person with authority to represent him in an action; or
 
 
 57
 (c) The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary; or
 
 
 58
 (d) An official or agency invested by law with authority to represent the person's interest; or
 
 
 59
 (e) The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member.
 
 
 60
 Restatement (Second) of Judgments § 41(1) (1980). In adopting this Restatement section, we specifically rejected application of the doctrine of virtual representation in the context of former class action litigation where "the plaintiff was not a class member bound by a previous adjudication and [did] not fit any other category of persons 'represented' by a party in the previous action." Bittinger, 123 F.3d at 880. We explained, in examining our decision in Becherer III, that "Richardsbinds us to a rule of res judicata limited to parties and their 'privities'" which "may not be extended, as... under a broad 'virtual representation' doctrine, to a class never certified." Id. at 882. Bittinger did not expressly hold that res judicata could not bind a nonparty by a showing of privity through control or a legal relationship of accountability. In essence, Bittinger held that acquiescence cannot be shown in a class action case where the nonparties opt out of the class and there is no other court approval of representation by a party. See id. at 880, 882.
 
 
 61
 Moreover, in Bittinger, both sets of plaintiffs were selected by a common voluntary association formed exclusively for a litigation purpose; and, the association hired the attorney for both suits, authorized both suits, and bore the costs of both suits. See id. at 885-86 (Ryan, J., Dissenting). Bittinger himself had been advised by counsel not to file independently while the first suit was in progress because his interests were being represented there. See id. at 886. There can be no doubt, in light of the Bittinger holding, that members of an involuntary association formed for a nonlitigation purpose cannot be held to a judgment against other members of the association, or against the association itself, when the second group takes concrete steps to protect its autonomy by hiring and paying for separate counsel, opting out of a proposed settlement class, and filing an independent action.
 
 
 62
 Here, the district court reached the class certification question with respect to the contract issues, but not the remaining claims, whereas the district court in the previous litigation relevant to Bittinger dismissed the case without reaching the certification question. See id. at 879. However, although the district court here rendered a decision on the remaining claims after the settlement and settlement class collapsed, the court never addressed the certification question as to the claims adjudicated after the Florida plaintiffs opted out. When the district court issued its opinion adjudicating the fraud claims in the Becherer litigation, the Florida plaintiffs had already filed an action in state court. By failing to address the issue of class certification as it related to the remaining non-contract claims adjudicated in its August 1992 opinion and order, the district court failed to provide the Florida plaintiffs notice that these issues would be adjudicated on behalf of any class in which they were included or an opportunity to exclude themselves from any potential class. The court did not otherwise approve designation of the Becherer plaintiffs as representatives of the Florida plaintiffs with respect to those claims.
 
 
 63
 The only acceptable indicator of the Florida plaintiffs' acquiescence or lack thereof lies in their decision to opt out and file a case in state court. Under these circumstances, as in Bittinger, "the plaintiff was not a class member bound by a previous adjudication and does not fit any other category of persons 'represented' by a party in the previous action." Id. at 880. Thus, as in Bittinger, "the plaintiffs in the instant case are not precluded from pursuing their claims. Section 41 clearly requires 'approval of the court' for a representative of a class to 'represent,' for privity purposes, later plaintiffs." Id. at 882 (citation omitted).
 
 
 64
 As Judge Karen Nelson Moore's opinion observes, "By failing to rule on class certification with respect to the remaining claims, the district court rendered judgments with uncertain preclusive effect. The result has been six years of additional litigation." Opn. at 30. Although we decline, in light of Bittinger, to adopt Judge Moore's Discussion of virtual representation, we otherwise concur with her thoughtful Discussion of Rule 23(b)(3), and her Conclusion that "the Florida plaintiffs are not precluded from pursuing their fraud claims by the Becherer judgment." Opn. at 433.
 
 IV.
 
 65
 We hold that res judicata only precludes the Florida plaintiffs from relitigating thecontract claims against SSG that were adjudicated by the district court in May 1991 and August 1992, and for which the district court certified a class that included the Florida plaintiffs. The Florida plaintiffs did not have actual control over the first action, were not able to hold the Becherer plaintiffs or Simon legally accountable for the result in the first action, and timely exercised their right to opt out of the settlement class or timely reserved that right. Because the district court never provided the Florida plaintiffs notice and an opportunity to opt out of any class certified with respect to the remaining claims, the Florida plaintiffs are not precluded from pursuing their remaining claims against the remaining defendants independently of the Becherer plaintiffs in state court.
 
 
 66
 We REVERSE the decision of the district court, and we VACATE its injunction.
 
 
 67
 KAREN NELSON MOORE, Circuit Judge, Concurring in the judgment.
 
 
 68
 Having certified a plaintiff class only as to certain claims, the district court proceeded to enter judgment in favor of the defendants on a variety of other claims raised in this Federal Rule of Civil Procedure 23(b)(3) class action (the "Becherer action"). Subsequently, the district court determined that a number of absent class members (the "Florida plaintiffs") were bound by the judgment on the non-class claims under the doctrine of virtual representation.
 
 
 69
 Like the majority, I believe that preclusion through virtual representation should be applied very sparingly in the class action context. To do otherwise is to undermine the procedural protections afforded by the Federal Rules of Civil Procedure and to discourage the efficient litigation of claims through class actions. Applying the doctrine sparingly and observing that the conduct of the absent members in this case generally was consistent with legitimate class behavior, I too would hold that the Florida plaintiffs were not virtually represented by the Becherer plaintiffs, and that the Florida plaintiffs should be bound by the Becherer judgment only to the extent of their inclusion in the certified class.
 
 
 70
 In my view, however, the majority has adopted an unduly narrow rule of virtual representation in the class action context. According to the majority, a plaintiff who opts out of a Rule 23(b)(3) class and does not control the litigation may be bound by the judgment only if a party to the action is legally accountable to the opt-out plaintiff for the result. Because I believe that such a formulation essentially nullifies the virtual representation doctrine and that other factors may warrant a finding of preclusion by virtual representation in the class action context, I concur only in the judgment.
 
 I.
 
 71
 The majority opinion sets forth the facts and procedural history of this case clearly and accurately, and I will not repeat the exercise. Because the Becherer action was a putative class action, however, I think it appropriate to consider the application of the class action rules and precedents to this case before turning to the virtual representation analysis.
 
 
 72
 Before 1966, actions for damages could be prosecuted in the federal courts as class actions without binding the absent class members prior to judgment. See Premier Elec. Constr. Co. v. National Elec. Contractors Ass'n, 814 F.2d 358, 362 (7th Cir. 1987). Absent class members were permitted to intervene and take advantage of a victory by the plaintiff in a "spurious class action," but only the named plaintiff was bound if the defendant prevailed. The 1966 revisions to Rule 23 were designed, in part, to end this one-way intervention. See id. Now the district court is required to determine whether a class is maintainable, "[a]s soon as practicable after the commencement of an action brought as a class action." Fed. R. Civ. P. 23(c)(1). If an action is to be maintained pursuant to Rule23(b)(3), absent class members are to be provided "the best notice practicable under the circumstances" and an opportunity to exclude themselves from the class. Fed. R. Civ. P. 23(c)(2). Once this opt-out date has passed, absent members are bound by the judgment. In order to prevent one-way intervention, it is critical that the district court make the certification determination and direct notice to the absent class members at an early stage in the litigation.
 
 
 73
 Here, the district court properly certified a class with respect to the contract claims against Shelter Seagate Corporation and its affiliates ("SSG") and a conditional class for the purposes of ratifying the proposed settlement. I believe the district court erred, however, when it conducted hearings, issued judgments, and otherwise permitted the litigation of the fraud and other claims against Merrill Lynch and the remaining defendants to proceed without first addressing the class certification issue. It is not enough that the "plaintiffs' [November, 1989] motion to certify a class on the fraud and remaining claims was not denied by" the district court, or that "no party raised the need to again certify a class." Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 809 F. Supp. 1259, 1266 (E.D. Mich. 1992) ("Becherer II"). The district "court has an independent obligation to decide whether an action brought on a class basis is to be maintained even if neither of the parties moves for a ruling" on certification. 7B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1785, at 89-90 (2d ed. 1986). In order to curtail one-way intervention, the district court must rule expeditiously on certification and provide an early opt-out date that limits the opportunity of the absent class members to sit on the sidelines without committing to the class.
 
 
 74
 Neither the district court nor Merrill Lynch have argued that the Florida plaintiffs are bound by the Becherer judgment on the basis of their status as class members; nor could they, as a contrary result clearly would violate due process. The Supreme Court has held that in a Rule 23(b)(3) class action seeking to bind known plaintiffs on claims predominantly for monetary relief, the absent plaintiffs must be provided with notice and an opportunity to opt out. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12 (1985). Again, it is up to the district court to ensure that the absent plaintiffs' due process rights are satisfied through the issuance of appropriate notice. Here, the potential class members may have been informed of the progress of the litigation by the Association of Unit Owners ("AUO"), but the district court was not entitled to rely on this mechanism. Moreover, even if the absent investors had notice of the fraud litigation, a formal opt-out opportunity was required. The court already had certified two Rule 23(b)(3) classes (one conditionally) for limited purposes and had provided opt-out opportunities. Given the procedures adopted by the district court for the management of this action, the absent investors surely were entitled to expect to receive notice and an opportunity to opt out with respect to the litigation of the remaining claims against the remaining defendants.[1]
 
 
 75
 By failing to rule on class certification with respect to the remaining claims, the district court rendered judgments with uncertain preclusive effect. The result has been six years of additional litigation.
 
 II.
 
 76
 Although the district court purported to rule against the "plaintiff class" in resolving the non-contract claims in Becherer I, see Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 799 F. Supp. 755, 767-79 (E.D. Mich. 1992) ("Becherer I"), the foregoing analysis establishes that the nonparties to this action cannot be bound by the judgment on these claims as class members. Recognizing this, the district court turned in Becherer II to the theory of adequate or virtual representation. See Becherer II, 809 F. Supp. at 1267-69.
 
 
 77
 Traditionally, only a party or one held to be in privity with a party could be bound by a judgment. The privity concept has been stretched over the years, but the circumstances under which preclusion may be exercised against a nonparty remain limited. To be bound, a nonparty must exercise control over an action, consent to be bound by a judgment, or, in certain circumstances, be represented by a party to an action. See 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4448 (2d ed. 1986). Under the doctrine of virtual representation, a nonparty whose interests are aligned with a party to an action may be bound by the judgment in that action if due process is satisfied and the equities so dictate. In balancing the equities, courts generally have considered whether there is an express or implied legal relationship between the nonparty and the party to the action; whether the nonparty had notice of, participated in, or consented to have its interests represented in the action; whether there is a family or other close nonlitigating relationship between the nonparty and the party; whether the party to the action had a sufficient incentive to litigate; and whether the party or nonparty was engaged in maneuvering to avoid the preclusive effect of the action. See id. § 4457; Gonzalez v. Banco Cent. Corp., 27 F.3d 751, 760-62 (1st Cir. 1994); Tyus v. Schoemehl, 93 F.3d 449, 455-56 (8th Cir. 1996), cert. denied, 520 U.S. 1166 (1997).
 
 
 78
 The doctrine of virtual representation originated in probate practice, in which it often is necessary to bind absent interests, but the theory has made inroads into general civil litigation. See Wright, Miller, and Cooper, supra, § 4457. It appears, however, that the doctrine may have reached its zenith several decades ago. In 1975 the Fifth Circuit stated a particularly broad theory of the doctrine in Aerojet-General Corp. v. Askew, 511 F.2d 710, 719 (5th Cir.), cert. denied, 423 U.S. 908 (1975): "Under the federal law of res judicata, a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." In recent years the theory has been utilized sporadically, additional requirements have been recognized, and the amorphous nature of the doctrine has been criticized. See, e.g., Tice v. American Airlines, Inc., 162 F.3d 966 (7th Cir. 1998) (concluding that virtual representation adds nothing to traditional privity analysis).
 
 
 79
 The theory of virtual representation, like preclusion doctrine generally, reflects a tension between competing interests. In order to resolve that tension and apply the equitable doctrine in a principled fashion in a specific case, courts may find it helpful to consider the matter in two steps. First, I would ask whether the context of the case, here, Rule 23(b)(3) class action litigation, warrants relatively liberal or sparing application of the doctrine. Second, I would consider whether the facts of thecase justify the application of virtual representation given the context.
 
 
 80
 In assessing how readily virtual representation should be applied in a given context, courts should consider the strength of the litigant's claim to a day in court, the fairness of requiring a party to a previous action to relitigate, and the implications for judicial efficiency. It is "[o]ur deep-rooted historic tradition that everyone should have his own day in court...." Wright, Miller, and Cooper, supra, § 4449, at 417. The right of each individual to assert her own cause of action and to be heard is grounded in the Due Process Clauses of the Fifth and Fourteenth Amendments. Thus, while one need not always be a party to a judgment in order to be bound by it, nonparty preclusion should not be applied lightly. Moreover, courts should be particularly circumspect in applying preclusion doctrines when individualized rights are at stake. See Richards v. Jefferson County, Alabama, 517 U.S. 793, 803 (1996). See generally Robert G. Bone, Rethinking the "Day in Court" Ideal and Nonparty Preclusion, 67 N.Y.U. L. Rev. 193 (1992). Courts also must recognize the complexity of the efficiency analysis, as a finding of preclusion does not necessarily preserve resources in either the short or the long run. In the short run the judicial resources involved in the preclusion determination detract from the savings attributable to precluded actions. In the long run ready preclusion based on virtual representation may discourage efficient, coordinated action on the part of litigants.
 
 
 81
 I conclude that virtual representation should be applied sparingly in the context of class action litigation undertaken pursuant to Rule 23(b)(3).[2] The claim of an absent plaintiff in a Rule 23(b)(3) class to an independent day in court is particularly strong: Unlike the absent members of a (b)(1) or (b)(2) class, the potential (b)(3) member cannot be bound by the judgment as a class member unless the notice and opt-out provisions of Rule 23(c) are complied with.
 
 
 82
 Efficiency considerations also caution against finding virtual representation too readily in cases in which a plaintiff has opted out of a class or in which a class was proposed but never was certified. In order to avoid discouraging efficient litigation through class actions, we must not penalize prospective class members from participating in and consenting to the representation up until the time that a class has been formed and the opt-out date has passed. Likewise, a certain amount of "maneuvering" is intended in the class action process. The potential class member is encouraged to monitor the litigation and make a decision as to whether her interests are being served up until the opt-out date.
 
 
 83
 Moreover, it generally will not be unfair to the defendant to permit relitigation by an excluded class member. Typically, when virtual representation has been invoked to preclude a bystander to the first action from pursuing a subsequent action, it has been the case that the bystander would have prevailed in effect had the plaintiff to the first action prevailed[3]. Inthis situation the bystander loses nothing by failing to join the plaintiff in the first action: If the plaintiff prevails in the first action, the bystander prevails; if the defendant prevails in the first action, the bystander can relitigate, unless precluded by virtual representation. It is the asymmetry of the situation, as well as the difficulty of achieving repose in cases in which the potential number of plaintiffs is very large, that generates concerns regarding fairness to the defendant.
 
 
 84
 By contrast, in a class action for damages the excluded class member generally will not be entitled to take advantage of a favorable judgment. The excluded party cannot invoke the judgment directly, and she probably will not be permitted to invoke offensive nonmutual collateral estoppel ("offensive estoppel") to avoid relitigation in a subsequent action. In Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979), the Supreme Court approved the use of offensive estoppel but held that "[t]he general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where... the application of offensive estoppel would be unfair to a defendant, a trial Judge should not allow the use of offensive collateral estoppel." Because a plaintiff who opts out of a class action easily could have joined it, that plaintiff generally will not be permitted to invoke offensive estoppel. See, e.g., Premier Elec. Constr. Co., 814 F.2d at 367. If offensive estoppel is unavailable, the excluded class member and the defendant are in same position: neither is bound with respect to the other. In such a case there is no incentive for a potential class member to adopt a bystander role and no strong fairness or efficiency reason for the application of virtual representation.
 
 III.
 
 85
 Given the class action context and the desirability of applying virtual representation doctrine sparingly, I conclude that the Florida plaintiffs are not precluded from pursuing their fraud claims by the Becherer judgment. As an initial matter, although I would apply the virtual representation doctrine sparingly in this context, I do not believe that it is appropriate to limit the factors a district court may consider in the second stage of the analysis, that is, in judging the equities. It is on this point that my approach diverges from that of the majority. Virtual representation has been applied to a broad range of cases and, as an equitable doctrine, cannot be cabined usefully into a bright-line rule. Thus, by sparing application, I mean that preclusion should not be found unless the case is compelling; I do not mean to limit the breadth of the equitable inquiry. Accordingly, I would hold that the district court, properly guided by concerns for the litigants' right to a day in court, the fairness of permitting relitigation, and judicial efficiency, may consider the factors listed in Part II above, as well as other relevant considerations. I would hold that the only absolute prerequisite to a finding of privity by means of virtual representation is that there exist an identity of interests between the parties to the two actions. See Wright, Miller, and Cooper, supra, § 4457; Gonzalez, 27 F.3d at 760[4]. Muchmore, of course, will be needed to justify preclusion through virtual representation, particularly when the first stage of the analysis dictates sparing application of the doctrine, but, having found an identity of interests, the district court should then consider a broad range of factors in balancing the equities.[5]
 
 
 86
 In the present case it is uncontested that the Florida plaintiffs and the Becherer plaintiffs share an identity of interests, and thus I turn to the other factors considered by the district court and suggested by the cases. Whether control is considered as an element of virtual representation or as a separate doctrine of privity, the facts do not support the Conclusion that the Florida plaintiffs controlled the Becherer suit directly or through the AUO. Although the AUO initiated the litigation and coordinated funding, it is not clear that the AUO controlled the litigation. The Becherer action was not litigated by an organization on behalf of its membership; this case was brought as a putative class action on behalf of six named investors and the class of investors, and the case largely was treated as such. Moreover, as to the fraud claims, I cannot agree with the district court that there existed an express or implied legal relationship through which the Becherer plaintiffs were accountable to the Florida plaintiffs. Although the class representative assumes a fiduciary relationship with respect to a certified class, see Sondel v. Northwest Airlines, Inc., 56 F.3d 934, 938 (8th Cir. 1995); Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077-78 (2d Cir. 1995), the fiduciary responsibilities of the representatives to a putative class, if any, are uncertain.[6] See Deposit Guar. Nat'l Bank, Jackson, Mississippi v. Roper, 445 U.S. 326, 340 n.12 (1980).
 
 
 87
 The Becherer plaintiffs certainly had a sufficient incentive to litigate the fraud claims. In fact, each of the class members had a sizeable claim. Thus, adequacy of representation does not weigh against a finding of virtual representation. However, I question the district court's Conclusion that the Becherer plaintiffs and the Florida plaintiffs had a close nonlitigating relationship. Aside from their common participation in the hotel venture and their involuntary joint membership in the AUO, there was no relationship between these plaintiffs prior to the litigation.
 
 
 88
 There is no doubt that the Florida plaintiffs had notice of the action. Even if the AUO had not provided updates, the court had twice directed notice with respect to the two classes that it certified[7]. As noted above, however, I believe that the notice factor weighs against a finding of virtual representation in this case. Having received notice and an opportunity to opt out of two classes, the absent investors reasonably could expect to receive the same noticeand opportunity to opt out with respect to the fraud litigation. Moreover, given the significant rejection of the proposed global settlement of these claims, it is clear that the opportunity to opt out was not a mere formality.
 
 
 89
 Further, although it is evident that a number of the Florida plaintiffs participated in the Becherer litigation and provided financial support, it must be remembered that the Florida plaintiffs were members of a certified class with respect to the contract claims against SSG, one of which was not resolved until August 1992, when the fraud claims were resolved. Moreover, even after the proposed settlement failed, the Florida plaintiffs may have expected to become members of a litigating class with respect to the fraud claims. As the district court noted, the plaintiffs' motion for class certification remained open throughout the action. See Becherer II, 809 F. Supp. at 1266.
 
 
 90
 The Florida plaintiffs apparently were apprized of the progress of the litigation in the final months preceding the resolution of the fraud claims; many of the Florida plaintiffs provided affidavits in this period. See Becherer IV, 920 F. Supp. at 1367. The district court inferred from this knowledge and participation that the Florida plaintiffs consented to be bound by the litigation: "All parties in the several hearings proceeded on the basis that my decisions would bind all investors." Becherer II, 809 F. Supp. at 1265. The first problem with this Conclusion is that the Florida plaintiffs were not parties to the Becherer litigation of the fraud claims, and the Becherer plaintiffs could not speak for them. The second problem is that true consent to be bound in this fashion would have been foolish. Had the Florida plaintiffs wished to be bound, surely they would have pushed for certification on the fraud claims in order to bind the defendants expressly. Thus, although tacit consent to be bound has served as a basis for finding preclusion by virtual representation, see, e.g., Cauefield v. Fidelity & Cas. Co. of New York, 378 F.2d 876, 877 (5th Cir.) (stay of one proceeding indicated tacit agreement to be bound by result of second proceeding), cert. denied, 389 U.S. 1009 (1967), I cannot conclude that bystanding in the present case indicates a consent to be bound. See also Wright, Miller, and Cooper, supra, § 4453, at 454 ("Great care should be taken... to ensure that the circumstances actually warrant the implication that there was in fact an agreement to be bound.").
 
 
 91
 Similarly, I am not persuaded that maneuvering or manipulation on the part of the Florida plaintiffs justifies preclusion. In order to find a forfeiture of the due process right to a day in court in the class action context, the court must find maneuvering that extends beyond the confines of that sanctioned under Rule 23. The district court and Merrill Lynch focus on the fact that the Florida plaintiffs used the Becherer suit in seeking to gain a stay in separate foreclosure proceedings, that these plaintiffs intended to use a favorable ruling in the Becherer action for preclusive effect in the foreclosure litigation, and that the Florida plaintiffs postponed pursuing individual actions, taking a "wait and see" approach to the Becherer litigation. The district court's fact finding indicates, however, that the Florida plaintiffs sought to stay the foreclosure actions in 1990. At this point, of course, the complaint had been filed and class certification had been sought, but no certification decisions had been made. Thus, it was reasonable for the Florida plaintiffs to have assumed and argued that their claims would be litigated as part of the class in the Becherer action and that the outcome of the action would have preclusive effect[8]. Similarly, it wasnot unreasonable or manipulative for the Florida plaintiffs to take a "wait and see" approach regarding the fraud claims until the district court certified a class on those claims and provided a deadline for opting out. The Becherer plaintiffs moved for certification as to all of the claims back in 1989. Had the defendants felt that the potential class members were being allowed to stand by for an excessive period, the defendants could have moved for a certification decision on the fraud claims. Ultimately, however, it was the responsibility of the district court to ensure timely certification and provide a deadline for exclusion that would force the absent investors to decide whether to opt out of the class.
 
 
 92
 Finally, I think it important to consider what would have happened if the Becherer plaintiffs had prevailed on one or more of the fraud claims. In the absence of certification of the class prior to judgment, I do not believe that the Florida plaintiffs could have recovered directly on the judgment. As Rule 23 is intended to end one-way intervention, post-judgment certification in a Rule 23(b)(3) case generally should be impermissible.[9] See International Union, UAW v. Donovan, 746 F.2d 839 (D.C. Cir. 1984) (post-judgment certification impermissible), rev'd on other grounds, 477 U.S. 274 (1986); but see Postow v. OBA Fed. Sav. & Loan Ass'n, 627 F.2d 1370 (D.C. Cir. 1980) (post-judgment certification permissible in certain circumstances). The Florida plaintiffs could have attempted to use a favorable judgment on the fraud claims in the Becherer action offensively to estop relitigation of these issues in the Florida action, but it appears that Florida does not recognize offensive nonmutual collateral estoppel in purely civil actions. See Florida Bar v. Clement, 662 So. 2d 690, 697 (Fla. 1995), cert. denied, 517 U.S. 1210 (1996). Moreover, even if the Florida courts were to follow the rule of Parklane and permit nonmutual estoppel, I think it unlikely that offensive nonmutual collateral estoppel would have been available in this instance. Had the Florida plaintiffs sought to do so, they could have formally or informally pushed for class certification. In any event the hypothetical preclusive effect of a plaintiff victory in this action is as uncertain as the effect of the actual loss has been. Thus, it is unlikely that the Florida plaintiffs expected to be able to stay out of a class with respect to the fraud claims and yet profit from a favorable result. I do not see the risk or reality of manipulation in this case.
 
 IV.
 
 93
 Rule 23 is designed to protect the due process rights of absent class members. While I would not hold that a putative class member never may be bound by a judgment in the absence of complete compliance with Rule 23, I believe we should be very hesitant to apply preclusion through virtual representation in order to fill in gaps in the provision of notice and the right to opt out of Rule 23(b)(3) class actions. I am not persuaded that the Florida plaintiffs engaged in activity that is inconsistent with their role as members of one class and potential members of another. Certainly, I do not see behavior that justifies preclusion by virtual representation. Applying that doctrine sparingly, I conclude that the Florida plaintiffs are not bound by the Becherer judgment on the claims that were resolved outside the certified class.
 
 
 94
 Accordingly, I concur in the judgment.
 
 
 
 NOTES:
 
 
 [1]
 The complaint alleged a class pursuant to Rule 23(b)(3), and the district court certified one class and conditionally certified a second class pursuant to this rule. Although absent members need not be given notice and an opportunity to opt out of Rule 23(b)(1) and (2) class actions, I believe that the court was correct in certifying the classes pursuant to Rule 23(b)(3), and that certification under the other provisions would have been inappropriate, particularly with respect to the fraud claims. Because recovery was not sought from a common fund and the risk of inconsistent adjudication as to damages does not constitute prejudice for the purposes of Rule 23(b)(1), there was no potential prejudice to the plaintiffs or the defendants that would justify certification pursuant to Rule 23(b)(1). Moreover, certification pursuant to Rule 23(b)(2) would have been inappropriate as the plaintiffs principally sought damages. See Jack H. Friedenthal, Mary Kay Kane, & Arthur R. Miller, Civil Procedure § 16.2, at 732-34 (2d ed. 1993).
 
 
 [2]
 I express no opinion as to the applicability of the doctrine to Rule 23(b)(1) or (2) class actions. At least one court has applied the doctrine in the context of an unperfected state-law class action seeking declaratory relief, an action apparently analogous to a Rule 23(b)(2) action. See Jackson v. Hayakawa, 605 F.2d 1121, 1124 (9th Cir. 1979), cert. denied, 445 U.S. 952 (1980).
 
 
 [3]
 See, e.g., Petit v. City of Chicago, 766 F. Supp. 607 (N.D. Ill. 1991) (police officers precluded from challenging promotion examination by prior suit); Crane v. Commissioner of Dep't of Agric., 602 F. Supp. 280 (D. Me. 1985) (milk producers seeking to challenge state act held to be in privity with association that brought prior suit); see also Bezanson v. Bayside Enters., Inc. (In re Medomak Canning), 922 F.2d 895 (1st Cir. 1990) (junior claimants bound by settlement agreed between bankruptcy trustee and senior claimants); Eubanks v. FDIC, 977 F.2d 166 (5th Cir. 1992) (Mrs. Eubanks's claims precluded as derivative of claims of her husband that were settled in a previous bankruptcy confirmation action).
 
 
 [4]
 Some of our opinions also have required "'the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues,'" Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 43 F.3d 1054, 1070 (6th Cir. 1995) ("Becherer IV") (quoting Benson and Ford, Inc. v. Wanda Petroleum Co., 833 F.2d 1172, 1175 (5th Cir. 1987)), and this, essentially, is the position of the majority. I agree with Professors Wright, Miller, and Cooper, however, that making this relationship a prerequisite vitiates the doctrine of virtual representation. See Wright, Miller, and Cooper, supra, § 4457, at 500. Thus, I would consider the existence of such a relationship to be a factor rather than a prerequisite in the virtual representation analysis. Accord Gonzalez, 27 F.3d at 760. Professors Wright, Miller, and Cooper suggest that adequacy of the litigation also should be a central requirement. Most courts have treated adequacy of representation as a factor rather than as a prerequisite, see Gonzalez, 27 F.3d at 761-62, and courts generally have viewed the incentive to litigate the first action as a proxy for the adequacy of the litigation. See Tyus, 93 F.3 455-56.
 
 
 [5]
 For similar reasons, I do not find the categorical approach of the Restatement of Judgments to be helpful in virtual representation analysis. See Restatement (Second) of Judgments §§ 39-41 (1980). Under the Restatement, a nonparty may be bound who can be placed within a particular cubbyhole: One who substantially controls an action may be bound under § 39. One who agrees to be bound by an action may be bound under § 40. One who is represented by a trustee, fiduciary, or class representative may be bound under § 41. Under virtual representation doctrine, however, courts may consider several of these factors and determine that preclusion is warranted based on the totality of the circumstances.
 
 
 [6]
 Even if class representatives are legally accountable to putative members, I would discount the legal relationship that flows solely from the class relationship. To do otherwise is to penalize attempted class formation.
 
 
 [7]
 Only conditional certification was granted with respect to the settlement class.
 
 
 [8]
 Even after the district court's 1992 rulings, certain Unit Owners sought to continue to delay the foreclosure actions pending appeal of the Becherer action. See Becherer IV, 920 F. Supp. at 1366. At that point, of course, the district court had ruled that all of the Unit Owners were bound by the judgment. Thus, it was not unreasonable to seek delay of the foreclosure actions until the effect of the Becherer litigation was finalized.
 
 
 [9]
 By contrast, this court has upheld the contemporaneous entry of a judgment in favor of a plaintiff class and the certification of that class in a Rule 23(b)(2) class action in which provision of notice and an opportunity to opt out are not required. See Alexander v. Aero Lodge No. 735, 565 F.2d 1364 (6th Cir. 1977), cert. denied, 436 U.S. 946 (1978).
 KENNEDY, Circuit Judge, Dissenting.
 Judge Moore's Concurring opinion sets out comprehensively the formulation and the development of the virtual representation theory. Judge Moore's formulation, with which I agree, closely approximates the formulation of virtual representation as discussed in Wright, Miller, & Cooper:
 To justify preclusion by virtual representation on this broad view, there must be "some special relationship between the parties justifying preclusion." The factors considered in evaluating the relationship include identity of interests, a close relationship in fact, participation in the prior litigation, apparent acquiescence, and deliberate maneuvering to avoid the effects of the first action. In addition, "adequacy of representation" is to be considered.
 
 
 [18]
 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4457 (1981) (footnote omitted). My disagreement with Judge Moore is in the result of applying the aforementioned factors and judging the equities in this case. I would reach the opposite result, i.e., that the Florida plaintiffs were virtually represented and are bound by the Becherer judgment and may not pursue those fraud claims as to which the district court held the Florida plaintiffs were virtually represented
 In this case, the district court considered each of the aforementioned factors and concluded that the Florida plaintiffs had been virtually represented. "The question whether a party's interests in a case are virtually representative of the interests of a nonparty is one of fact for the trial court." Aerojet General Corp. v. Askew, 511 F.2d 710, 719 (5th Cir. 1975). After a lengthy hearing, the district court found:
 
 
 [1]
 Membership in the AUO is mandatory for all investors in the hotel. Each Florida plaintiff therefore is a member of the AUO
 
 
 [2]
 The AUO sought counsel for the Becherer suit. It paid attorney Elwood S. Simon $250,000 to investigate the claims which were the subject of the suit. It also arranged and participated in meetings with counsel for the Becherer suit, Elwood S. Simon, concerning strategy for the suit. The court further determined that the unit owners as a group had "many opportunities" to object to the AUO's litigation efforts, but instead gave a positive "overall response." Class action status reports were a routine subject at AUO Board and Advisory Board meetings as well as unit owner's meetings
 
 
 [3]
 The AUO implemented a comprehensive strategy to advance the unit owner's interest vis-a-vis the foreclosure proceeding. It actively encouraged unit owners to withhold mortgage payments
 
 
 [4]
 In 1990, Florida plaintiffs' counsel, Thomas Grady, represented to a Florida state court that the resolution of the Becherer case in the Eastern District of Michigan would determine the rights of his clients in the Florida case
 
 
 [5]
 At least twenty-two Florida plaintiffs provided affidavits in the Becherer lawsuit in order to bolster Simon's opposition to defendants' motion for summary judgment
 
 
 [6]
 The AUO raised funds and recruited members for the Becherer suit. Approximately 29 Florida plaintiffs responded to the solicitations and contributed $14,500 of the total $58,500 unit owners contributed to the class-action expense fund
 
 
 [7]
 Becherer plaintiffs' counsel, Simon, and Florida plaintiffs' counsel, Grady, extensively shared information. The court noted that they "worked closely together at the time that litigation strategies were being formulated" and "worked as a team to further their mutual interests."
 
 
 [8]
 Grady had a "working relationship" with the AUO Board and with some of the Becherer plaintiffs
 
 
 [9]
 At least four Florida plaintiffs retained Simon to represent them
 
 
 [10]
 Grady acknowledged that the Florida plaintiffs' interests were substantially identical to those of the AUO
 
 
 [11]
 Grady stated that Simon, in his prosecution of the Becherer suit, was adequately representing the Florida plaintiffs' interests. Conversely, Simon claimed adequately to have represented the Florida plaintiffs' interests
 
 
 [12]
 Grady recognized that his clients might be bound by the outcome in the Becherer lawsuit and advised the Florida plaintiffs that they might be so bound whether or not a class was certified for all claims
 
 
 [13]
 Florida plaintiffs' counsel, Grady, opted to wait for the outcome of the Becherer suit to see if it furthered his clients' objectives before proceeding with the second lawsuit
 
 
 [14]
 The Florida plaintiffs decided to forego individual claims against the defendants so that they could "wait and see" if the class action furthered their objectives
 Based on these factual findings, the court found a "special relationship." The Florida plaintiffs do not attack these factual findings, but contend they are insufficient for the court to conclude that the Florida plaintiffs were virtually represented in the Becherer litigation beyond the trial of the contract claims for which the class of unit owners was certified.
 The district court also found that the Florida plaintiffs' interests had been adequately represented. This, too, seems not to be seriously contested. There is complete identity of interest between the Becherer plaintiffs and the Florida plaintiffs with respect to the fraud claims as to which the district court found res judicata. All the claims are based on the same documents and agreements. Any individual unrelated fraud claims that any plaintiff has, such as to whether the hotel was a suitable investment, were not foreclosed.
 While Judge Moore has concluded that the AUO did not control the litigation it initiated and funded, there was considerable evidence that it assisted in the ongoing litigation by paying for the damages expert used by the class in the contract trial and amending its AUO agreement with the Registry to make Registry's legal fees and expenses a "hotel expense" paid for by the unit owners and paying the expenses of the president of the AUO to testify at trial. AUO's 1992 budget included $360,000 in legal costs with the explanation to the unit owners that "[t]hese legal expenses are not just the AUO's role in the class action lawsuit." AUO's counsel, Susan La Cava, extensively assisted with the class action. The Board of AUO helped recruit the class representative. While membership in AUO was mandatory, the Florida plaintiffs, represented by Grady, cooperated in the litigation. Only one unit owner opted out of the class that was certified for the contract claims. The first summary judgment had been granted long before that date. Class counsel would seem to have some fiduciary duty to all the unit holders in view of the AUO's financing of the ongoing litigation on their behalf. I also believe this evidence was sufficient to support findings by the district court of both consent and maneuvering.
 In my opinion, the aforementioned considerations all tend to show that the Becherer plaintiffs were the virtual representatives of the Florida plaintiffs. There is yet another factor, however, which neither the majority opinion nor Judge Moore's concurrence addresses, that I believe must be considered in "judging the equities." I believe it is necessary to consider those claims that the district court found were barred and their relationship to the claims tried in the class action. There appear to be four separate fraud claims alleged in both the Becherer and Florida litigation. The district court decided the merits of these claims in the Becherer litigation and subsequently held them barred by virtualrepresentation from further litigation in the Florida case.[1]
 My colleagues overlook the fact that these four fraud claims are most likely barred anyway in the Florida litigation pursuant to state law. While Florida does not recognize offensive estoppel, Florida applies the economic loss rule, a doctrine which generally bars a tort action for purely economic losses. The rule as pronounced by the Florida Supreme Court in Florida Power & Light Co. v. Westinghouse Elec. Corp., 510 So.2d 899 (Fla. 1987) (contract for goods), and AFM Corp. v. Southern Bell Telephone and Telegraph Co., 515 So.2d 180, 181-82 (Fla. 1987) (contract for services) holds that without some conduct resulting in personal injury or property damage, there can be no independent tort claiming solely economic losses flowing from a contractual breach. See Leisure Founders, Inc. v. CUC Int'l, Inc., 833 F.Supp. 1562, 1572 (S.D. Fla. 1993). The rule's purpose is to keep the risk of liability in commercial transactions reasonably calculable. See Bay Garden Manor Condominium Assoc. v. James D. Marks Associates, Inc., 576 So.2d 744, 745 (Fla. Dist. Ct. App. 1991). "Where the parties have limited liability and allocated risk by agreement, tort remedies should not be allowed to supersede the parties' prior understanding of the consequences of deficient performance." Leisure Founders, 833 F.Supp. at 1572.
 Therefore, in Florida, if a plaintiff has both a claim for breach of contract and a claim for fraud relating to performance of the contract, the economic loss rule precludes recovery under the fraud theory of liability. See id. Fraud in the inducement of a contract, however, is a cause of action entirely independent from breach of contract, requiring proof of facts separate and distinct from the breach of contract, and with separate and consistent remedies. See HTP. Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So.2d 1238, 1239 (Fla. 1996).
 True fraudulent inducement attends conduct prior to striking the express or implied contract and alleges that one party tricked the other into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort. Where the complainant alleges fraudulent inducement, but the facts comprising the fraudulent inducement claim are closely interwoven with... those constituting the breach of contract, the economic loss rule bars the pleading of a separate tort claim.
 Leisure Founders, 833 F.Supp. at 1572 (citations and quotation marks omitted). Thus, where the facts give rise to a claim for breach of contract, the economic loss rule will bar claims for fraud in the performance of a contract, but not claims for fraud in its inducement.[2]
 In three of the four fraud claims alleged in the Becherer and Florida suits, the facts relating to the alleged fraud are "closely interwoven" with those facts constituting the breaches of contract tried and resolved by the district court in the Becherer case.
 In one of the four fraud claims, the Florida plaintiffs contend that Merrill Lynch and SSG made material misrepresentations of the requirements for closingof title. They allege that the Private Placement Memorandum ("PPM"), Merrill Lynch Marketing Guide, and affidavits of former Merrill Lynch sales agents represented that the hotel had to be fully completed prior to closing. The Unit Sale Agreement--the sales contract--however, had a merger and integration clause which explicitly stated that the purchaser acknowledges he or she has not relied on any other representations made by the seller or seller's agent. The Unit Sale Agreement required SSG only to "substantially complete" the hotel prior to closing. On August 7, 1992, Judge Feikens found that SSG breached the contract by not "substantially completing" the hotel prior to closing (although he found no damages.) See Becherer, et al. v. Merrill Lynch, et al., 799 F.Supp. 755, 768-69 (E.D. Mich. 1992).
 In another fraud claim, the Florida plaintiffs complain that Merrill Lynch and SSG materially misrepresented that SSG would purchase furnishings, fixtures, and equipment ("FFE") for the hotel when both knew that SSG intended to lease these items. Plaintiffs claim that this conduct violated rule 10b-5 of the Securities Exchange Act, and constituted common law fraud and negligent misrepresentation. In its August 7, 1992 opinion, the district court found that SSG breached the Unit Sale Agreement with regard to FFE terms and awarded damages in the class action[3]. In the same decision, the court also held that securities law and state common law prohibit double recovery for the same violation, so recovery under a fraud theory of liability was foreclosed. See Becherer, 799 F.Supp. at 769.
 In a third fraud claim, the Florida plaintiffs contend that Merrill Lynch violated Rule 10b-9 and 15c2-4 of the Securities Exchange Act by allowing the closing of title to occur on October 31, 1986 despite Merrill Lynch's knowledge that all conditions for closing were not met. The plaintiffs' amended complaint in the contract class action alleged this same claim as a breach of contract, however[4]. Judge Feikens determined that Rules 10b-9 and15c2-4 did not apply to the conduct of which plaintiffs complained. Rather, these rules apply to the issuer's or broker's obligation to cancel an offering and provide a refund if there is less than a full or specified subscription to the shares being offered. In his August 7, 1992 opinion in the contract class action, Judge Feikens held that Merrill Lynch did not breach the contract because it satisfied these rules on February 15, 1985, when the minimum sales conditions were met and the escrow was closed, irrevocably binding the investors. Because Rules 10b-9 and 15c2-4 do not apply to Merrill Lynch's conduct after February 15, 1985, Judge Feikens dismissed this fraud claim. See Becherer, 799 F.Supp. at 770.
 Unlike the three claims described above, plaintiffs' fourth fraud claim involves "conduct prior to striking the express or implied contract and alleges that one party tricked the other into contracting." See Leisure Founders, 833 F.Supp. at 1572. The plaintiffs allege that the PPM neglected to state that another hotel built on Pelican Bay would be a Ritz-Carlton, and that the materials omitted the competitive impact of this hotel. In an Order dated November 20, 1990, Judge Feikens granted summary judgment for the defendants on this claim. See Becherer, 799 F.Supp. at Appendix B. This order was issued before the district court's certification of any class.
 In any litigation that would proceed in Florida state court, operation of the economic loss rule would appear to foreclose the first three claims described above. The facts of the first claim, misrepresentation in the requirements for closing of title, and the second claim, that Merrill Lynch and SSG materially misrepresented that SSG would purchase rather than lease FFE, are clearly allegations of fraud relating to the performance of the Unit Sale Agreement rather than fraud in inducement of the agreement. Breach of contract was therefore the appropriate theory of liability for the alleged conduct.
 As regards the third claim, the securities fraud claim, the plaintiffs chose to proceed under a breach of contract theory of liability in the class action. See n.4, supra. The underlying facts of their securities fraud claim, that Merrill Lynch allowed the closing of title to take place on October 31, 1986, are indistinguishable from its conduct relating to performance of its alleged contractual obligations. In Florida, it appears that securities fraud claims--both state and federal--are barred by the economic loss rule when the plaintiff also has a breach of contract claim if the particular deception alleged relates to performance of terms memorialized in the agreement rather than inducement to enter the agreement. See Mergens v. Dreyfoos, No. 95-8793-CIV, 1997 WL 611576, *3 (S.D. Fla., July 18, 1997), aff'd 166 F.3d 1114 (11th Cir. 1999). See also Leisure Founders, 833 F.Supp. at 1571-72 ("It is clear that Florida law bars all claims for fraud where the plaintiff has a remedy in contract for the breach."). When the plaintiffs recast what were originally alleged as fraud claims or securities claims as breaches of contract, and tried these claims as breaches of contract, they subjected those claims as well to the economic loss rule.
 While the fourth claim, i.e., that the defendants failed to disclose that the other "luxury hotel" under development nearby was a Ritz Carlton, is indisputably a claim of fraud in the inducement, the plaintiffs included in the class breach of contract claim the claim that Merrill Lynch failed to inform the members of the class "of adverse information known [to it] that would have allowed them to protect their respective interests and avoid incurring damages." The plaintiffs then litigated the issue of whether they were damaged by the nearby construction of a Ritz Carlton (rather than some other luxury hotel) in their contract trial. The district court held that the plaintiff class failed to prove that the fact the other luxury hotel was a Ritz Carlton made any difference to thesuccess of plaintiffs' own luxury hotel. Once again, when the plaintiffs recast what was originally alleged as a fraud claim as a breach of contract, and tried this claim as a breach of contract, it seems to me that in equity they should be foreclosed from re-litigating the same facts and damages under a different theory of liability.
 As Judge Moore observes in her concurrence, it is not appropriate to limit the factors that a district court may consider in judging the equities. Some of the fraud claims that the Florida plaintiffs seek to litigate in state court would seem to be foreclosed, regardless of any finding of virtual representation, by Florida law. Absent affirmance of the district court's decision to enjoin litigation of the fraud claims for this reason alone (which to me appears sufficient), this consideration should at least figure into the "judging of the equities" that the court must undertake to determine whether the Florida plaintiffs were virtually represented. It is at least anomalous that counsel represents a party on one legal theory but does not even virtually represent the same party for the same claim because it is brought on a different legal theory.
 This approach necessarily translates into a broader theory of virtual representation applicable in class actions than that espoused by Judge Moore. The Eighth Circuit observed in Tyus v. Schmoel that a broader theory "give[s] wider use to virtual representation. This liberal use better accommodates the competing considerations of judicial economy and due process... [T]he notion that a party is entitled to his day in court... [is] better addressed through a careful application of the doctrine to the facts in a given case than by artificially limiting the scope of the doctrine. Tyus v. Schmoel, 93 F.3d 449, 455 (8th Cir. 1996). Careful application of the doctrine to the facts in this case leads me to agree with the result reached below. I would affirm the decision of the district court.
 NOTES:
 
 
 [1]
 The district court's judgment did not seek to bar claims relating to registration under the Florida Securities Act or individual claims as to suitability of the investment.
 
 
 [2]
 Although it is not relevant to resolution of the instant case, it is worth noting that the Florida Supreme Court has determined that some statutory fraud actions, such as claims under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) involving consumer transactions based on a written sales contract, are not barred by the economic loss rule. See Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc., 693 So.2d 602, 610-11 (Fla. Dist. Ct. App. 1997). In the case of FDUTPA claims relating to consumer transactions based on written sales contracts, the Florida District Court of Appeals determined that application of the rule would frustrate the intent of the state legislature to provide "expanded remedies for recovering economic losses suffered as a consequence of deceptive and unfair trade practices and acts." Id. at 609.
 
 
 [3]
 In addition to money damages, plaintiffs sought recission of the purchase for material breach of contract in the class action. Although the court found breaches of the contract, it also found that the plaintiffs failed to prove that any of the breaches caused them economic loss. Thus, plaintiffs were not entitled to recission. The damages awarded to them of $6,000,000 were to make them whole for their right under the contract to have defendants pay for the furnishings, etc. rather than lease them.
 
 
 [4]
 When plaintiff class filed its amended complaint it recast its securities fraud claims as breaches of contract when it alleged:
 In connection with its sale of Hotel Interests, Merrill Lynch entered into customer agreements (or had previously entered into customer agreements) with each of the Plaintiffs and members of the Class to act as their broker/dealer and, as implied by the terms of the customer agreements and/or its conduct, Merrill Lynch was required to act fairly, in good faith and in full compliance with federal securities laws in its dealings with Plaintiffs and members of the Class.
 * * *
 (e) Merrill Lynch further breached each of the customer agreements and its obligations incurred in connection with its participation in the Offering (and sale) of Hotel Interests to Plaintiffs and members of the Class by failing to comply with Rule 10b-9 and Rule 15c2-4 (promulgated by the SEC pursuant to and under the Exchange Act) in (1) allowing the delivery of the Investors deposits, Mortgage Notes, Mortgages, and other investment documents (which Merrill Lynch held in escrow for its customers) to Midwest Title pursuant to the escrow closing on February 15, 1985, when Merrill Lynch knew that the Subscriptions of Plaintiffs and members of the Class had been automatically cancelled [sic] as a result of failure to provide timely notice of financing approval and/or as a result of the expiration (not later than February 1, 1985) of the offering period for Hotel Interests, and (2) over 20 months thereafter, allowing the breaking of Midwest Title escrow and the closing of the sale of Hotel Interests to Plaintiffs and members of the Class to occur on October 30, 1986 prior to Hotel being physically complete, unencumbered, and fully operable for its intended purpose as a world class, luxury resort hotel.
 BOYCE F. MARTIN, JR., Chief Judge, Dissenting.
 I join Judge Kennedy's Dissent. In the third opinion rendered by this Court in this case, I Dissented from the panel's decision, and I continue to remain convinced both that the Florida plaintiffs' interests in the claims against Merrill Lynch were substantially identical to those of the Becherer plaintiffs, and that the Becherer plaintiffs adequately represented the interests of the Florida plaintiffs.
 This case for me presents the best evidence I have seen of why litigation involving substantial real estate transactions is ill-suited for the courts. Each of the investors in the Registry Hotel was substantially financially able to personally undertake a reasonable investigation before investing in the project. Whatever the cause of the dispute, both the Eastern District of Michigan and this Court have devoted far too much time and effort to a matter that should long since have been resolved.
 The return of this case for a fourth review of matters meticulously examined by courts in Michigan and Florida is a terrible waste of the current limited resources of our judicial system. The Florida plaintiffs were part of the class certified with respect to the contract claims against SSG and were part of a class that was conditionally certified for settlement purposes as to all issues. Although no class was certified for purposes of resolving the fraud claims, the district court correctly found that the Becherer plaintiffs and Florida plaintiffs had substantially identical interests in the claims against Merrill Lynch and that the Becherer plaintiffs adequately represented the Florida plaintiffs.
 We review the district court's factual findings regarding adequacy of representation for clear error. See Sanders Confectionery Prods. v. Heller Fin., 973 F.2d 474, 481 (6th Cir. 1992) (citing King v. South Cent. Bell Tel. & Tel. Co., 790 F.2d 524, 530 (6th Cir.1986)); Fed. R. Civ. P.52(a). Of course, the ultimate legal determination of res judicata is subject to de novo review. Sanders, 973 F.2d at 480.
 In Becherer III, this Court stated that the doctrine of virtual representation
 requires more than a showing of parallel interest or, even, a use of the same attorney in both suits.... The question of virtual representation is one of fact and is to be kept within "strict confines." Virtual representation demands the existence of an express or implied legal relationship in which the parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues.
 43 F.3d at 1070 (quoting Benson & Ford, Inc. v. Wanda Petroleum Co., 833 F.2d 1172, 1175 (5th Cir. 1987) (citations omitted)). Thus, the essential prerequisite for a finding of virtual representation is an express or implied legal relationship in which the parties to the first suit are accountable to the parties who bring the second suit.
 In addition, this Court cited four additional factors that support a finding of virtual representation: (1) a close, non-litigating relationship between the parties in the two suits, (2) participation by the second parties in the first suit, (3) apparent acquiescence in the prior proceedings, and (4) deliberate maneuvering by the second parties to avoid the effects of the previous suit. Id. (quoting 18 Charles A. Wright et al., Federal Practice and Procedure § 4457 (1981)).
 After reviewing the district court's opinion, I believe that this Court should affirm its determination that the Florida plaintiffs were virtually represented by the Becherer plaintiffs in the earlier action, and that they are bound by this Court's prior decision. The district court carefully evaluated voluminous evidence in this case and concluded that there was an express or implied legal relationship that made the Becherer plaintiffs accountable to all Unit Owners, including the Florida plaintiffs. Specifically, the district court found that the requisite accountability existed because the Becherer plaintiffs and their counsel, Simon, owed a fiduciary duty to, and thus were accountable to all Unit Owners, including the Florida plaintiffs. See Sondel v. Northwest Airlines, 56 F.3d 934, 938 (8th Cir. 1995). The AUO and Unit Owners provided substantial financial and other assistance and participated in the Becherer action. They also influenced the conduct of the litigation in the Becherer action.
 The Florida plaintiffs argue that the requisite legal relationship can only be found in a few precise situations--trustees and beneficiaries, agents and principals, fiduciaries, legal representatives, and class representatives--articulated in the Restatement of Judgments (Second) § 41 (1981). However, Merrill Lynch correctly points out that nothing in our prior opinions suggests such a limited scope for the doctrine; rather, this Court's suggestion that "this case may yet be an appropriate one for the application of res judicata and collateral estoppel" strongly suggests that we did not intend to limit virtual representation to the situations listed in the Restatement. Becherer, 43 F.3d at 1071; see also Tyus v. Schoemehl, 93 F.3d 449, 454 (8th Cir. 1996) (rejecting view that parties should be bound under a theory of virtual representation only in very limited, technical situations).
 Moreover, the district court found that the other four factors cited by Wright & Miller were present in this case. Specifically, it found that the Florida plaintiffs shared a close, non-litigating relationship with the Becherer plaintiffs because, as Unit Owners, all had invested in the same enterprise, and every Unit Owner was a member of a legal entity--the AUO--which existed before the action was ever filed, and which elected a board and held regular meetings.
 Second, the district court found that the Florida plaintiffs had participated in the Becherer plaintiffs' litigation. It foundthat the AUO, to which all Florida plaintiffs belonged, authorized and financed the investigation and prosecution of the Becherer plaintiffs' lawsuit by hiring attorney Simon under an agreement that specifically contemplated class litigation. Furthermore, the AUO paid Simon $250,000, of which over $58,000 was collected from Unit Owners, including $14,500 from twenty-nine Florida plaintiffs. The district court also found that the AUO controlled the investigation and prosecution of the Becherer plaintiffs' lawsuit by continuing to communicate with class counsel throughout the Becherer action.
 Third, the court found that the Unit Owners, including the Florida plaintiffs, acquiesced in permitting the Becherer plaintiffs to represent their interests. Grady, Simon, and the AUO all acknowledged that they believed that the Becherer plaintiffs were adequately representing all Unit Owners' interests. None of the Florida plaintiffs objected to the AUO's funding of and involvement in the Becherer action, and no Unit Owner sought to pursue individual claims until the Florida plaintiffs filed this second action. There was also evidence that Grady told the Florida plaintiffs to "wait and see" if the results of the Becherer action would be favorable before acting themselves.
 Fourth and finally, the district court found that the Unit Owners deliberately maneuvered to obtain the benefits of the Becherer action while avoiding its detriments, using the earlier suit as a "test case" to see how their rights would be determined, and filing their own action years after the Becherer action began, and only then upon the district court's imminent summary judgment ruling against the Becherer plaintiffs.
 I believe that these findings amply support the district court's Conclusion that virtual representation applies to bind the Florida plaintiffs to the result in the Becherer action. None of the criticisms raised by the Florida plaintiffs in their brief is sufficient to find that the district court's factual determination was clearly erroneous. Given the facts found by the district court, I cannot say that it erred in finding that the doctrine of virtual representation is appropriate in this case.
 This case reminds me of my childhood reading, and I could not say it better than Charles Dickens did in Bleak House, referring to the case Jarndyce and Jarndyce:
 At the present moment (August, 1853) there is a suit before the court which was commenced nearly twenty years ago, in which from thirty to forty counsel have been known to appear at one time, in which costs have been incurred to the amount of seventy thousand pounds, which is A FRIENDLY SUIT, and which is (I am assured) no nearer to its termination now than when it was begun. There is another well-known suit in Chancery, not yet decided, which was commenced before the close of the last century and in which more than double the amount of seventy thousand pounds has been swallowed up in costs. If I wanted other authorities for Jarndyce and Jarndyce, I could rain them on these pages, to the shame of -- a parsimonious public.
 This case was first filed on August 21, 1989. Ten years later, it is still in court. With modern technology, we should have been able to do better. I therefore respectfully Dissent.