**UNITED STATES of America,**
**Plaintiff,**

v.

**William J. DAVIS, Defendant.**

**United States of America, Plaintiff,**

v.

**Marilyn K. Davis, Defendant.**

**Nos. CR–3–99–110(1), CR–3–99–110(2).**

United States District Court,
S.D. Ohio,
Western Division.

May 9, 2002.

David J Horne, United States Attorney's Office, Dayton, OH, for Plaintiff.

Vincent Paul Popp, Popp & Tuss, Cheryll Antoinette Bennett, Dayton, OH, for Defendants.

DECISION AND ENTRY OVERRULING DEFENDANTS' MOTIONS TO DISMISS FOR PRE–ACCUSATORY DELAY (DOC. #s 51 & 52) AND OVERRULING DEFENDANT MARILYN K. DAVIS'S MOTION TO DISMISS BASED ON COLLATERAL ESTOPPEL (DOC. # 53)

RICE, Chief Judge.

On December 15, 1999, the Grand Jury indicted William J. Davis ("Mr. Davis") for

the commission of five federal crimes, including the making of false statements on bank financial statements (Counts 2 & 3), defrauding a federally insured bank (Counts 4 & 5), and conspiracy to do the same (Count 1). His wife, Marilyn K. Davis ("Mrs. Davis"), was charged in the same Indictment (Doc. # 1) on the fraud and conspiracy counts. Presently, Mr. Davis moves to dismiss the Indictment on the grounds that it was brought only after prejudicial delay (Doc. # 51). Mrs. Davis has adopted her husband's Motion and submits the same (Doc. # 52). Additionally, Mrs. Davis alone moves to dismiss on the alternative ground that the matter as to her is barred on the theory of collateral estoppel (Doc. # 53). The Government submits that the Motions are without merit and should be overruled.

I. *Factual Background*

18 U.S.C. § 1014 makes it a federal crime to make false financial statements or overvalue property pursuant to a loan or loan extension application with a federally insured bank for the purpose of influencing the bank's decision as to such loan or loan extension. In Count 2, Mr. Davis is charged with violating this section in the spring of 1990 by making false financial statements and overvaluing property for the purpose of influencing the First National Bank of Dayton ("FNB"), which is federally insured, to extend a loan to Fries Correctional Equipment, Inc. ("FCEI"), the company which he served as president.[1] Count 3 charges him with a similar violation allegedly committed in June of 1991. Counts 4 & 5 charge both Defendants with executing the object of their conspiracy (i.e., committing fraud against

FNB) on two occasions, the first time on July 29, 1991, by submitting a personal financial statement to FNB which failed to disclose the existence of a personal debt, and a second time on April 15, 1992, by denying in a deposition any ownership in certain corporate securities. Both of these acts, if true, constitute violations of 18 U.S.C. § 1344. The conspiracy to commit such acts, if it existed, constitutes a violation of 18 U.S.C. § 371. All alleged criminal activity at issue is alleged to have taken place no later than December of 1992.

With respect to Defendants' Motions at issue, the Court held an evidentiary hearing on the matters presented on January 7, 8, & 9, 2002.[2] Testimony given during that hearing can be summarized as follows. Defendants at one time had a financial interest in FCEI. FCEI obtained a loan from FNB and that loan was personally guaranteed by Defendants. Despite obtaining the assistance of a bonding company, Ohio Casualty, to help it complete a construction project for which it had contracted with the State of Connecticut ("Connecticut contract"), FCEI failed as a business and defaulted on the FNB loan. In turn, it went into receivership. For his part, Mr. Davis testified that on or around May 7, 1992, he was personally escorted off the premises of FCEI by authorities acting pursuant to a court order from Judge Petzold of the Montgomery County (Ohio) Common Pleas Court, arising out of a civil action brought by FNB against FCEI to secure its loan. He further testified that he never returned to the premises, that he took with him only an empty briefcase, that he was never contacted by

---

**1.** FCEI operated as a construction project general contractor.

**2.** The January hearing was limited to facts relevant to the issues of pre-indictment delay and collateral estoppel. To the extent it was

possible, the Court did not allow questioning that went to the merits of the Indictment. Herein, where reference is made to the transcripts of the individual hearing dates, January 7, 8 & 9, said transcripts will be designated as "Tr.1," "Tr.2," and "Tr.3," respectively.

anyone notifying him that he could collect personal belongings, and that he was told at some point that certain documents had been destroyed.

In the intervening period of time, between FCEI's default and the present, FNB has attempted without much success to collect on the defaulted loan from both FCEI and Defendants. Part and parcel to these collection efforts, FNB conducted an investigation of Defendants' financial activities, suspecting them of illegal dealings. In fact, the bank filed a suspicious activity report in 1992 or early 1993, which precipitated a criminal investigation of Defendants by the FBI. Thereafter, the bank and the FBI cooperated in their respective investigations of Defendants. In August of 1993, the United States Attorney for the Southern District of Ohio sent Mr. Davis, who was then living in Wichita, Kansas, what is known as a "target letter," putting him on notice that the Government intended to initiate criminal proceedings against him on account of false statements he had allegedly made on financial statements submitted to FNB.

> This [target letter] is to advise you that this office intends to initiate criminal proceedings against you in United States District Court regarding your falsification of financial statements given to First National Bank..[sic] Please have your lawyer contact me within 20 days, whether the lawyer is appointed or retained. If you cannot afford a lawyer, you may contact the Pretrial Services Officer [at the Federal Building in Dayton] to complete a financial affidavit and determine if you qualify for an appointed lawyer.

(Letter of August 16, 1993, attached to Doc. # 51.) Mr. Davis testified that he did not hear again from the Government until he was served with the Indictment, over six year later.

In 1994 or 1995, Defendants initiated bankruptcy proceedings in the United States Bankruptcy Court, in Wichita, Kansas. With respect to their petition, FNB filed an adversarial claim against them, and, pursuant thereto, successfully blocked the discharge of their debt to it. As a result, Defendants remain personally indebted to FNB. The Government was not a party to the adversarial proceeding.

## II. *Analysis*

The Court will first address Mrs. Davis's Motion to Dismiss Based on Collateral Estoppel (Doc. # 53) and then address the Motions to Dismiss for Pre–Accusatory Delay (Doc. # s 51 & 52). The Defendants have both filed post-hearing briefs in support of dismissal (Doc. # s 75 & 77), which the Government has opposed (Doc. # 79). In evaluating the merits of the Motions to Dismiss, the Court shall consider these briefs along with the original filings.

### A. *Motion to Dismiss on the Basis of Collateral Estoppel (Doc. # 53)*

Mrs. Davis contends that her involvement in any fraudulent scheme, as charged by the Grand Jury, is based on her submission of certain financial statements to FNB. She further contends that this issue has already been fully and fairly litigated in the Kansas bankruptcy proceedings, and that the Bankruptcy Court found that she did not submit any such statements and was not aware of the contents of such submissions (which were made, in fact, by Mr. Davis). As a consequence, she argues that the Indictment cannot be further prosecuted against her, at least to the extent it is based on the submission of the same financial statements to FNB.

"Collateral estoppel, otherwise known as issue preclusion, refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decid-

ed." *Cockrel v. Shelby County School Dist.,* 270 F.3d 1036, 1046 (6th Cir.2001) (citation and internal quotation omitted). "That doctrine applies only if (1) the precise issue raised in the present case [was] raised and actually litigated in the prior proceeding; (2) determination of the issue [was] necessary to the outcome of the prior proceeding; (3) the prior proceeding resulted in a final judgment on the merits; and (4) the party against whom issue preclusion is sought had a full and fair opportunity to litigate the issue in the prior proceeding." *Stern v. Mascio,* 262 F.3d 600, 608 (6th Cir.2001) (citation, internal quotation, and alterations in original omitted).

■ The Court need not explore the particular factual findings made by the Bankruptcy Court in the Kansas adversarial proceeding, as Mrs. Davis cannot meet the fourth factor set forth in *Stern,* to wit, she cannot show that the Government was a party to that proceeding such that it had a full and fair opportunity to litigate the issues which cause her to be joined to the Indictment. She argues that the Government is in privity with FNB, which was a party to the adversarial proceeding. It is her theory that FNB's and the Government's "independent" investigations into the affairs of the Davises have in fact been one in the same, such that the one is the alter ego of the other, and that they should be regarded as the same entity for these purposes.

■ Mrs. Davis is correct to note that the fourth factor can be satisfied by a showing that a party who was not involved in the prior litigation nevertheless is in privity with a party which was. *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 43 F.3d 1054, 1069 (6th Cir.1995)(*Becherer I* ). She is not correct, however, in arguing that, in this case, the Government is in privity with FNB. "A nonparty will be considered in privity, or

sufficiently close to a party in the prior suit so as to justify preclusion, in three situations: First, a non-party who has succeeded to a party's interest in property is bound by any prior judgments against the party.... Second, a non-party who controlled the original suit will be bound by the resulting judgment.... Third, federal courts will bind a non-party whose interests were represented adequately by a party in the original suit." *Id.* at 1069–70 (alterations in original) (citation omitted). Herein, the first basis for a finding of privity clearly cannot be invoked, and Mrs. Davis rests her argument on bases two and three, which the Court will address in turn.

Regarding the second basis for finding that parties are in privity, Mrs. Davis has not demonstrated that the Government maintained the requisite control over FNB in its adversarial proceeding. "To have control of litigation requires that a person have effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action. He must also have control over the opportunity to obtain review." *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 193 F.3d 415, 423 (6th Cir.1999)(*en banc* )(*Becherer II* ) (internal quotation and citation omitted). Thus, Mrs. Davis is required to demonstrate that the Government initiated FNB's adversarial claim against the Davises and dictated how that claim was to be developed and prosecuted. In other words, she is required to show that the Government held all the strings with respect to FNB's legal actions related to its interest in the Davises' bankruptcy. *See id.* Such was not the case. Mrs. Davis has failed to adduce any factual support for her contention that the Government controlled FNB's adversarial action in the Bankruptcy Court in Kansas. Common interests in the business affairs of FCEI, and even interrelated and overlapping in-

vestigations by private parties and the Government, are to be expected where a common set of facts and circumstances give rise to potential civil and criminal liabilities. That the Government shares concerns and information with FNB does not give rise to a finding that it controlled FNB. *See id.*

Her argument that privity exists pursuant to the third basis fares no better. "Adequate representation," also referred to as "virtual representation," requires "more than a showing of parallel interest or, even, a use of the same attorney in both suits." *Becherer I,* 43 F.3d at 1070. It denotes "an express or implied legal relationship in which parties to the first suit are *accountable* to non-parties who file a subsequent suit raising identical issues." *Becherer II,* 193 F.3d at 424 (internal quotation and citation omitted)(emphasis in original). Herein, the Government's claims are, of course, criminal in nature. Although FNB may have anticipated, even hoped, that criminal charges would be forthcoming, the assertion that the interests of the United States of America were represented by FNB in the adversarial proceeding in the Kansas Bankruptcy Court, and that FNB is legally accountable to the Government for the actions it took therein, is unsubstantiated, and therefore without merit.

Because the Government was not an actual party to the adversarial proceeding, and because Mrs. Davis has not demonstrated that it is in privity with FNB, the Motion to Dismiss based on the doctrine of collateral estoppel must be OVER-RULED.

## B. *Motions to Dismiss for Pre–Accusatory Delay (Doc. # s51 & 52)*

▇▇ In furtherance of one's Fifth Amendment due process rights, a defendant is entitled to a dismissal of an indictment against him on the basis of the Government's pre-accusatory, or pre-indictment, delay if he can make two showings: (1) that he has been substantially prejudiced by the delay; *and* (2) that the delay was a tactical device employed by the federal prosecutor in order to gain an advantage over him. *See United States v. Rogers,* 118 F.3d 466, 474–75 (6th Cir. 1997). Because it finds that Defendants have adduced no evidence showing that the Government delayed bringing charges against them for the purpose of gaining a tactical advantage, the Court will overrule these Motions.

As a preliminary matter, the Court notes that neither Defendant has pointed to a case where a defendant actually succeeded in having her case dismissed for pre-indictment delay.[3]

Based on the hearing testimony, there is evidence that some business records of FCEI have been destroyed by various parties in recent years. For example, Michael Wolfe, a Senior Bond Claims Analyst for Ohio Casualty, who was a Bond Claims Supervisor at the time it had dealings with FCEI, testified that Ohio Casualty's records relating to the Connecticut contract were destroyed in 1999 or 2000 in the ordinary course of business. (Tr.2 at 11–12.) Furthermore, Frank Gollings, the appointed receiver for FCEI, destroyed FCEI personnel and payroll records in the spring of 2001. (Tr.3 at 19.) The acts of destroying these records are not themselves a concern to Defendants. Rather, it

---

**3.** The Court has found one case where a divided panel of the Ninth Circuit upheld such a dismissal. *United States v. Crouch,* 51 F.3d 480 (5th Cir.1995). In that case, a bank fraud indictment was brought over eight years after the alleged crimes took place. That ruling, however, was reversed upon *en banc* review. 84 F.3d 1497 (5th Cir.1996).

is the effect of such destruction on their defense which is of concern. Without some or many of the records that purportedly existed at FCEI, they argue that they will be unable to corroborate the legitimacy of their actions which give rise to the charges against them. Had the prosecution against them not been delayed for over six years from the time they received the target letter, they contend that they would have been in a better position to investigate the records of certain matters which have faded beyond memory, an action which has now been impeded by the purported destruction of the records. Thus, they cannot adequately develop and prepare for their defense, and therefore will be deprived of a fair trial.

██ Even if the Court assumes that these documents which have been destroyed would have been probative to the Davises' defense, such that their destruction is prejudicial, they have failed to demonstrate that the Government delayed its prosecution for the purpose of gaining a tactical edge over them. Mere delay of a prosecution, even where the lapse of time has caused prejudice, does not deprive a plaintiff of due process. *See United States v. Lovasco,* 431 U.S. 783, 796, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *Rogers,* 118 F.3d at 476. Where a defendant's concern is merely a function of the timing of his prosecution, the statute of limitations typically provides the temporal benchmark against which due process concerns are measured. *See Lovasco,* 431 U.S. at 789, 97 S.Ct. 2044. If it were otherwise, that is, if courts could conclude that a mere temporal delay were enough to give rise to a deprivation of due process even where the statutory period of limitations had not run, it would be tantamount to a judicial override of the legislative prerogative. Instead, Defendants must demonstrate, by evidence, not naked argument, that the Government intended to delay for the purpose of gaining an advantage. *See Rogers,* 118 F.3d at 476; *United States v. Brown,* 959 F.2d 63, 66 (6th Cir.1992).[4]

Defendants argue that the Court can "infer," for a number of reasons, that the Government delayed to do just that. The Court finds, however, that Defendants failed to adduce sufficient evidence at the evidentiary hearing to substantiate any such inference.

For commissions of, and conspiracies to commit, acts in violation of 18 U.S.C. §§ 1014 and 1344, the statute of limitations is ten years. 18 U.S.C. § 3293.[5] In the absence of any evidence that the Government delayed its case against Defendants herein to gain a tactical advantage at trial, if the Court were to draw an inference of bad faith from the fact that seven years have elapsed from the time of the last criminal act Defendants are charged with committing, it would negate the legitimacy of Congress' determination that the Gov-

**4.** Mr. Davis cites *United States v. $8,850,* 461 U.S. 555, 563, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983), for the proposition that the second prong can be satisfied by a showing that the Government acted with "reckless disregard" for the probable prejudicial impact on his and his wife's defense. The Court rejects this argument. Although the *$8,850* Court suggested that *Lovasco* could be read in this way, *$8,850* was not a pre-indictment delay case itself, and that Court addressed *Lovasco* only in response to the Government's argument therein that the *Lovasco* standard should be applied to the facts of that case, which con-

cerned a claim that the Government had failed to provide a timely civil forfeiture hearing to the claimant after she had had a sum of money seized by Customs officials. Its construction of *Lovasco* was cursory dictum, and is not the rule of the Sixth Circuit. *See Rogers, supra; Brown, supra.*

**5.** By contrast, the standard statute of limitations for non-capital federal crimes is 5 years. 18 U.S.C. § 3282. Section 3293 is an exception created for certain offenses against financial institutions.

ernment should have up to ten years to bring its case.

Nevertheless, the fact that the Government had actual evidence of Defendants' wrongdoing for over six years before the Indictment was filed, as evidenced by the August of 1993 target letter to Mr. Davis, is a little more troubling to the Court. Indeed, citing the definition of "target" in the Department of Justice Criminal Resource Manual, Defendants argue that this is an indication in itself that the Government had "substantial evidence" of criminal activity in 1993. The Court agrees that while it is one thing to say the Government should have ten years to discover evidence of wrongdoing and bring charges thereon, it is another to say it should have ten years to bring charges for acts of which it already has knowledge. In the latter scenario, the delay is more difficult to explain, as it is not obvious on the face of things why the case could not have been brought sooner. Still in all, in the absence of any evidence of bad faith or other wrongful intent, the Court should no more question the integrity of the U.S. Attorney's Office for its preparation of a criminal prosecution than it should that of Congress for its creation of the relevant statute of limitations. *See Lovasco*, 431 U.S. at 790–96, 97 S.Ct. 2044 (discussing the problems of holding the Government to a constitutional obligation to bring charges immediately upon a showing of probable cause or even when it believes it has proof beyond a reasonable doubt of the defendant's guilt).

Specifically, Defendants argue that the Government's intentional delay can be inferred from the fact that the FBI's investigation into the Davises' affairs was inseparable from FNB's investigation in the civil context, and that the Government is serving merely as the henchman of a vexed FNB, which has been frustrated in its attempts to collect that which FCEI and the Davises owe it. (Doc. # 51 at 4; Doc. # 75 at 6–9; Doc. # 77 at 7–10.) The Court finds it an incredible suggestion that the Government is using scarce resources merely to prosecute a civil dispute on behalf of a private party. As suggested earlier in the Court's analysis of Mrs. Davis's separate defense of collateral estoppel, overlapping and duplicative interests in criminal and civil matters are inherent to the type of charges at issue herein. In any event, there is no support in the record for Defendants' argument.

Relatedly, Defendants argue that the Government delayed bringing its Indictment so that it could benefit from incriminating statements made by them in the Kansas adversarial bankruptcy proceeding.

Obviously if an indictment had been issued in a timely fashion after that target letter of 1993, certain statements made by the Davises would not be available for the prosecution. Even if the prosecution does not rely on every statement the Davises may have made at their bankruptcy hearings in 1996, the very fact that they were on the stand, witnesses under oath, and subject to cross examination by a lawyer with the bank's investigator Sharyn Bennett[6] present in the bankruptcy proceedings, is evidence that this was delayed to get as much information from the Davises themselves so that it would be easier to prosecute. In other words, the delay was clearly to procure a tactical advantage.

(Doc. # 75 at 7.) What Defendants are suggesting, then, is that the Government

---

**6.** The presence of Sharyn Bennett is relevant to Defendants' argument because it is their theory that Bennett was more or less the source of all of the Government's information, and that the Government was conducting no independent investigation of its own. (*See* Doc. # 75 at 6–9; Doc. # 77 at 9–10.)

was required to indict them not merely before December of 1999, but, indeed, prior to FNB's adversarial proceeding against them, which the Court understands was commenced in either late 1994 or early 1995. (Tr.2 at 85–86.) Yet, the mere fact that a federal indictment is not the first salvo in a chain of proceedings arising out of the same nucleus of facts cannot itself create an inference of bad faith, lest it be the rule that the federal prosecutor must always be the first to prosecute. Such is not the rule. *See Brown,* 959 F.2d at 66–67 (rejecting argument that any inference of bad faith could be drawn from the fact that the federal prosecutor delayed its indictment until after defendant's guilty plea in state court). Moreover, by again relying on the power of suggestion alone, Defendants have failed to recognize that it is their obligation to demonstrate an actual, factual link between the passing of time, the adversarial proceeding, and the Government's intent to gain a tactical advantage. All they have introduced into the record is an argument that the Government has benefited from the adversarial proceeding, to their prejudice. However, *actual evidence of how this is the case has never even been mentioned,* let alone adduced. Again, while inferences may have justified holding the evidentiary hearing, they cannot sustain a dismissal of the criminal charges for pre-indictment delay.

For the reasons stated, the Court finds that the Defendants have failed to show that the Government acted with the inten-

tional and deliberate purpose of gaining a tactical advantage over them in this case. Accordingly, their Motions to Dismiss for Pre–Accusatory Delay (Doc. # s 51 & 52) are hereby OVERRULED.

While the Court bases its ruling principally upon the finding that Defendants have failed to introduce any evidence that the Government deliberately delayed its prosecution for tactical reasons, it notes in passing that the argument that they have been *substantially* prejudiced is also weak. As pointed out above, Defendants claim that they are prejudiced by their present inability to access certain documents which they contend would help substantiate their denials of culpability. According to Defendants, the fact that they do not have in their possession these purported exculpatory documents is the result of two factors: 1) the refusal of various parties to provide Mr. Davis access to such after he was removed from FCEI property; and 2) the subsequent destruction of these documents.

Even if it is true that Mr. Davis was denied access to FCEI records, a fact which by no means has been established,[7] and that these records have subsequently been destroyed, Defendants have not, for the most part, adduced evidence of the substance of the documents which have been destroyed, and which they claim they need to substantiate their defense. In *Rogers,* the Sixth Circuit addressed the implications that the death of a potential defense witness had to a defendant's claim

7. Mrs. Davis states in her post-hearing brief: "From the date of his removal from the premises of [FCEI], the Davises personal records and Fries' business records were made inaccessible to the Davises, despite requests for such." (Doc. # 77 at 5.) This assertion is not substantiated by the record. Although Mr. Davis testified that he was prevented from taking any records with him at the time he was escorted off FCEI property, that nobody ever notified him at any subsequent point in

time that he could return to obtain possession of these records, and that several subsequent discovery requests proved unfruitful (Tr.1 at 16–19), there was no testimony that he exhausted efforts to obtain copies of FCEI records from parties in their possession or control, such as Gollings. Along the same lines, Mr. Davis made no effort to have Wolfe preserve any FCEI records in the possession of Ohio Casualty. (Tr.2 at 14.)

of prejudice due to alleged pre-indictment delay. Analyzing the decisions of other circuits, the *Rogers* court observed that the death of a potentially material witness does not, taken alone, satisfy a defendant's "substantial prejudice" burden. 118 F.3d at 475. A defendant must be able to point to what the substance of the decedent's testimony would have been, that the substance of the testimony cannot be obtained through other sources, and that a jury would have been inclined to find it credible. *Id.* at 475–76.

It is no different with potentially exculpatory documents. Herein, with one limited exception which the Court addresses below, Defendants have not given the Court any indication of how the documents which have been destroyed would have been of any utility to their defense, and it is not intuitively obvious to the Court how such items bear upon the five counts charged in the Indictment. The Davises can either demonstrate prejudice, or they cannot; naked assertions that exculpatory documents were lost are not sufficient. *See United States v. Banks*, 2001 WL 1216973, at *2 (6th Cir. Oct.3, 2001). As it is, their speculative argument that potentially exculpatory documents have been lost over time demonstrates neither "actual" nor "substantial" prejudice, both of which are necessary elements of the first prong of any pre-indictment delay showing. *See, e.g., Rogers*, 118 F.3d at 475;

*United States v. Mask*, 154 F.Supp.2d 1344, 1348–1350 (W.D.Tenn.2001).

One aspect of Defendants' argument does deserve more particular attention. They make much of missing check vouchers for five separate checks which the Government apparently intends to introduce as evidence at trial. The Court understands that the Government will proffer these checks to show that Mr. Davis wrote FCEI checks to himself in violation of a debt subordination agreement that allegedly existed between FCEI and FNB, which apparently gave FNB senior rights to the assets of FCEI.[8] According to Mr. Davis, vouchers were used at FCEI to record the purpose for which a check was written. Without them, he stated at the hearing, he can neither remember the purpose for which the checks were written, nor prove that their issuance had been approved by Ohio Casualty, the bonding company with which it was dealing at the time FCEI went into receivership.[9] (Tr.1 at 21.) For several reasons, the Court is not persuaded that the inability to obtain copies of these vouchers *substantially* prejudices Defendants.

*First*, the probative value of these checks to the Government's case, if there is any, is limited to the conspiracy count. Counts 2 through 5 contain allegations to which these checks bear no relevance, and Defendants raise no other issues even remotely related to these other counts.[10]

---

**8.** In Count 1, the conspiracy charge, the Government alleges that on various dates, the earliest of which is February 4, 1992, "William J. Davis caused [FCEI] to pay money and funds of [FCEI] to William J. Davis." (Indictment, Overt Acts Nos. 10, 11, 13, 14, 20, 21, 23 & 26.)

**9.** Mr. Davis testified that FCEI became insolvent and had to turn to Ohio Casualty to meet its payroll and other bills associated with the Connecticut contract. The Court understands that what he is contending is that the issuance of the five checks which the Government in-

tends to introduce might very well have been approved by Ohio Casualty pursuant to the terms of its bailout, and therefore have been perfectly legitimate. (Tr.1 at 23.) Without the vouchers, he argues he cannot demonstrate such a defense.

**10.** Mr. Davis points out that Wolfe testified to a stack of records at FCEI as tall as counsel for Mrs. Davis (which, the Court believes it may note without offense to counsel, is something over five feet in height). (Tr.2 at 13.) More relevantly, Wolfe stated that *at least* 99 percent of the records concerned the details

Even with respect to the conspiracy count, it of course remains the Government's burden to prove beyond a reasonable doubt that the checks were written for an illegal purpose.

*Second,* other than his own testimony, Mr. Davis did not proffer any evidence that Ohio Casualty was required to authorize the issuance of any FCEI checks. This lack of corroborative testimony at a limited evidentiary hearing might not be so noteworthy were it not for the testimony of Wolfe, who was called by Defendants. Wolfe dealt directly with Mr. Davis and FCEI's comptroller after it became necessary for Ohio Casualty to bail FCEI out of the Connecticut contract. (Tr.2 at 6, 10.) In the process, he familiarized himself with the financial status of the company, and even traveled to the Connecticut job site to meet with the State's contract representatives. To help FCEI stay afloat and meet its contractual demands, Ohio Casualty loaned it $78,000 in early 1992 to help it with cash flow and to cover *outstanding* checks. (*Id.* at 9.) Notably absent from Wolfe's testimony was any indication that Ohio Casualty reserved the right to authorize how FCEI used that $78,000. (*See, e.g., id.* at 13.) Mr. Davis points out that Wolfe referred to "numerous checks" outstanding, but it is clear from his testimony that what Wolfe was referring to were checks that had been written by FCEI prior to the issuance of the loan, and which it did not have the funds to cover. (*Id.* at 8–9.) Not a single question was put to Wolfe on the issue of whether Mr. Davis was required to obtain

Ohio Casualty's approval prior to writing *any* checks on behalf of FCEI, *let alone checks to himself.* Mr. Davis emphasizes in his post-hearing brief that Wolfe was unable to recall specific checks and amounts, ostensibly arguing that this is probative evidence of prejudice. Again, however, the checks to which Wolfe referred were those which were outstanding at the time Ohio Casualty issued FCEI the $78,000 loan. (*Id.* at 9–10.) Defendants' own argument simply does not favor them. Furthermore, the question was never put to Wolfe whether he could remember specifically any checks drawn by FCEI to the order of Mr. Davis. The Court found Wolfe's recall of the FCEI–Ohio Casualty relationship fairly impressive, and it seems that at a hearing specifically designed to address the issue of prejudice, it was incumbent upon Defendants to elicit, from the one person who probably knew best whether Ohio Casualty might have authorized Mr. Davis to write himself checks drawn on FCEI's account, more than vague references to "stacks" of unidentified records and outstanding checks written prior to Ohio Casualty's intervention.[11]

In light of the fact that Wolfe, who was competent to corroborate Mr. Davis's testimony that FCEI was required to obtain authorization from Ohio Casualty before writing checks, did not in fact testify to that effect, the credibility of Mr. Davis's own self-serving testimony, admittedly based on vague recollections of events, is diminished. Given this, the Court has serious doubts that the check vouchers would

of construction projects in which FCEI was involved. (*Id.* at 12.) Defendants have proffered no testimony or evidence on the importance of these documents, or on the subject matter and importance of the other one percent or so. Without some kind of indication of how their destruction was prejudicial, it is of no moment that these records have been destroyed.

11. Given that Mr. Davis referred to an "accountant's voucher copy" and "a C.P.A. copy," as the two copies which FCEI maintained (Tr.1 at 21), Defendants might · also have called on their behalf FCEI's accountant or comptroller, or any such C.P.A. who may have been familiar with its practices.

prove to be as beneficial to the Davises' defense as they maintain. The potential exculpatory value of this lost evidence is speculative at best, and is not enough to substantiate a showing of "substantial prejudice." As such, for this reason, too, the Court would OVERRULE Defendants' Motions to Dismiss for Pre–Indictment Delay.

### III. *Conclusion*

The Court does not disagree that a delay of over six years seems unusually long, but that is beside the point.[12] The delay may have been for the reason suggested by FBI Agent Karen Fannin, who was the Government's investigator and who testified at the hearing on behalf of the Government: the heavy case load at the U.S. Attorney's Office caused a delay in developing the case. (Tr.2 at 104–05.) Or, it may have been for the reason proferred herein by the Government: the complexity of the case made it difficult to prepare, even for a long time after it had sufficient evidence to send Mr. Davis a target letter.[13] Whatever the truth may be, it is not the critical point, and the fact of the matter is that the Government is not required to prove a good faith reason for its delay. The burden of proof is on the Defendants to show that the opposite is true.

The critical point is whether that delay caused actual and substantial prejudice, and whether it was intentionally undertaken. Herein, there is no evidence that the Government intentionally delayed its case for purposes of gaining a tactical advantage. There is no evidence that the Government took part in any destruction or concealment of records, that it could have or should have known that any records would be ·destroyed, or that it sought to keep the Davises from procuring any helpful records. There is no evidence that the Government was in fact prepared to indict the Davises prior to the Kansas adversarial proceeding involving FNB, or, conversely, that it has benefitted from bringing its Indictment subsequent thereto. Finally, the Court has significant doubts as to whether Defendants have even been prejudiced, given that the most that they have shown is that *potentially* exculpatory records have been destroyed. Indeed, there is no evidence that the Government has actually gained a tactical advantage, such that it is in any better a position to prosecute the Davises today than it was a few years ago. While that may raise the question, "why not sooner?," by itself, that is a matter of prosecutorial discretion, and not the business of the Court. It only becomes a matter for the Constitution, and thus the Court, when the delay is shown to

**12.** *Cf. United States v. Brown,* 667 F.2d 566 (6th Cir.1982)(indictment brought over five and a half years after federal authorities began their investigation); *Banks,* 2001 WL 1216973 (indictment brought almost five years after federal authorities began their investigation); *Crouch,* 84 F.3d 1497 (indictment brought over six years after federal authorities began their investigation).

**13.** Defendants argue that the Government has not shown that this case was complex or required such a lengthy investigatory period. However, even if this is true, over the dissent of Justice Stevens, the *Lovasco* Court held that the Government's representations in its

brief and at oral argument that delay was due to its investigations must be assumed to have been made in good faith, and should be accorded deference. 431 U.S. at 796, 97 S.Ct. 2044; *contra id.* at 798–99, 97 S.Ct. 2044 (Stevens, J., dissenting)("While I do not question the good faith of Government counsel, it is not the business of appellate courts to make decisions on the basis of unsworn matter not incorporated in a formal record."); *see also Rogers,* 118 F.3d at 476 (acknowledging, pursuant to *Lovasco,* that the Government's unsworn assertion that its delay was due to the complexity of the case was entitled to deference).

have been intentional and prejudicial. In this case, no such showing has been made.

Accordingly, Defendants' Motions to Dismiss for Pre–Accusatory Delay (Doc. # s 51 & 52) are OVERRULED. In addition, because the Government was not a party to the adversarial proceeding in the Kansas Bankruptcy Court, and is not in privity with FNB, Mrs. Davis's Motion to Dismiss Based on Collateral Estoppel is also OVERRULED.